PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ALLEN E. SMITH; ELVIS H. HESTER,
JR.; LARRY R. WIGAL; FRANCIS
LENTZ; LESLIE S. HOLLOWELL;
THOMAS H. ADAMS; SHERMAN H.
BLANKENSHIP; ALICE S. CARR; DAVID
L. ARMBRISTER; JACQUELINE M.
ARMBRISTER; DRAPER VALLEY
BAPTIST CHURCH; WESTMINSTER
PRESBYTERIAN CHURCH
CORPORATION OF GREENSBORO, NORTH
CAROLINA; LARRY W. ARMBRISTER;
CAROLYN Q. ARMBRISTER,
individually and on behalf of all
others similarly situated,
                              *Appellants,*

DAVID PARTINGTON, Reverend,                No. 02-1535
individually and for the benefit of
the David Partington Rabbi Trust of
which he is beneficiary, and on
behalf of all others similarly
situated,
                    *Plaintiff-Appellant,*

                    v.

JOHN R. PENNINGTON; JAMES H.
PERRY; PATRICIA B. LANE; DAVID R.
TANNER; BRIAN KRAIDER; TOM
MASCHEL; DONALD G. LONG; JEFFREY
PAINE,
                *Defendants-Appellees,*

                    and

ROBERT H. GARNER; KEN JOHNSON;
U.S. CAPITAL FUNDING,
INCORPORATED; FIRST CAPITAL
SERVICES, INCORPORATED; FIRST
CAPITAL CORPORATION; THE
CHARTERHOUSE GROUP, LTD.,
                              *Defendants.*

CARL F. SCHOEPPL,
                        *Party in Interest.*

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
James C. Turk, Senior District Judge.
(CA-00-100)

Argued: October 31, 2003

Decided: December 18, 2003

Before LUTTIG and SHEDD, Circuit Judges, and
James H. MICHAEL, JR., Senior United States District Judge
for the Western District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Luttig wrote the opinion, in
which Judge Shedd and Senior Judge Michael joined.

## COUNSEL

**ARGUED:** John Francis Bloss, Sr., CLARK, BLOSS & WALL,
P.L.L.C., Greensboro, North Carolina, for Appellants. Gary Michael
Bowman, Roanoke, Virginia, for Appellees. **ON BRIEF:** David M.
Clark, CLARK, BLOSS & WALL, P.L.L.C., Greensboro, North Car-
olina, for Appellants.

**OPINION**

LUTTIG, Circuit Judge:

Plaintiff-appellant, the Reverend David Partington, sued defendants, including The Charterhouse Group, Ltd. ("Charterhouse"), and defendants-appellees ("appellees") for selling unregistered securities in violation of section 12(1) of the Securities Act of 1933, codified at 15 U.S.C. § 77l (2000). Partington sued individually and for the benefit of the Reverend David Partington Rabbi Trust (the "Partington Trust"), and also sought to represent a class of similarly situated individuals. After almost two years of litigation, the district court granted summary judgment against Partington because he lacked standing under section 77l, and also denied class certification. Appellants, who include other ministers, lay persons, and churches, moved for permissive intervention, filing in several groups both before and after the dismissal of Partington's claims. The district court denied appellants' motions, concluding that the statute of limitations had run on their claims. For the reasons stated below, we affirm the judgment of the district court in all respects.

I.

Partington, a Presbyterian minister, wished to save for his retirement. Consequently, he entered into a deferred compensation plan with his church, Shallowford Presbyterian Church ("Shallowford"), pursuant to which, as a general matter, Shallowford agreed to fund a rabbi trust[1] for Partington by diverting a portion of his salary into the trust, and to direct the trust to pay benefits to Partington or his beneficiaries upon his retirement or death. Shallowford, in turn, entered into a grantor trust agreement (the Partington Trust) with Charterhouse, which provided trustee services for rabbi trusts. In this agreement,

---

[1]Rabbi trusts are arrangements "approved by the I.R.S. in 1980 to allow employers to create trusts that would fund retirement plans for their employees without the funds in the trust being taxable to those employees in the years in which the contributors made those contributions. . . . These trusts were set up so that the employee had no economic benefit from the funds and was not in constructive receipt of the funds." J.A. 498 n.1.

Charterhouse agreed to act as trustee over the funds that Shallowford contributed to the trust, in order to provide Shallowford "with a source of funds to assist it in the meeting of its liabilities" to Partington. J.A. 499.

Partington claims that, in 1999, one R. Ray Levy approached Charterhouse and induced it to purchase viatical insurance contracts[2] as investments for the trusts Charterhouse administered, promising above-market returns. Clients of Charterhouse apparently invested more than one million dollars in these viatical contracts; it invested more than $34,000 in funds from the Partington trust. The viatical contracts were purchased from Financial Federated Title & Trust ("FinFed") using a broker controlled by Levy. In late 1999, Partington received notice that the entire investment from his trust in the viatical contracts was lost. All in all, of the 115 million dollars nationwide that was given to FinFed for the purpose of purchasing viaticals, only about six million dollars was actually so used.

Allegedly, Levy also persuaded Charterhouse to advise its clients to purchase senior notes from defendant U.S. Capital Funding, Inc. ("U.S. Capital"), a company Levy controlled, which notes purported to fund U.S. Capital's loans to well-known companies. Partington claims that Charterhouse used over $52,000 in funds from the Partington trust to purchase such a note from U.S. Capital, and that Charterhouse defendants persuaded numerous other ministers to invest in these notes. He asserts that members of his proposed class purchased over seven million dollars of these notes. U.S. Capital is now in bankruptcy, and has refused Partington's requests for payment on the note. Partington claims the investments made for the benefit of the Partington Trust all were made after consultation with and direction from him, without any input from his church.

Subsequently, Partington moved his ministry to Westminster Presbyterian Church ("Westminster"). Shallowford assigned its rights in the trust to Westminster; as part of that agreement, Westminster, unsurprisingly, replaced Charterhouse with Centura Bank as Trustee.

---

[2]"Viatical insurance contracts are made when a terminally ill person (the "viator") agrees to assign irrevocably the benefits of his life insurance policy to a third party" for a discounted amount. J.A. 499.

On February 20, 2000, Partington filed suit against defendants[3] and appellees, which included Charterhouse, U.S. Capital, and other entities, as well as several individuals Partington labels "Charterhouse agents."[4] After an extensive procedural history, the district court finally granted summary judgment against Partington on February 15, 2002, renewing, on its own motion, earlier-filed motions to dismiss, and reinterpreting them as motions for summary judgment. The court concluded that Partington was not the legal beneficiary of the Partington Trust, and thus could not be considered the "person purchasing" the alleged securities, as is required to maintain his federal securities claim. The court also denied class certification, primarily because Partington's failure to state a claim meant he could not adequately represent anyone who did. Given its conclusion as to the only federal claim in the case, the court dismissed Partington's state law claims for lack of jurisdiction. Partington moved for reconsideration of this order on March 18, 2002, but that motion was denied.

Additional parties moved for permissive intervention on four different occasions over the course of the litigation, in each case seeking to intervene individually and on behalf of all others similarly situated. Two groups of persons sought intervention prior to dismissal of the case, but the court did not act on their motions before dismissal. After the case was dismissed and reconsideration denied, two other groups of persons and churches filed motions for permissive intervention. The district court held a hearing and, on May 14, 2002, denied all motions for intervention. The court reasoned that appellants' claims were not entitled to equitable tolling because appellants were not within the class Partington was seeking to have certified over the course of the litigation, and thus the one-year statute of limitations had run on all of appellants' claims. Along with appellants, Partington appeals from the district court's orders granting summary judgment and denying class certification, denying reconsideration, and denying the motions for intervention.

---

[3]Over the course of the litigation, default judgment was entered against several defendants, including Charterhouse. In addition, other defendants have been dismissed from the case during the course of this appeal.

[4]As explained by the district court, Levy was, "in typical law school fashion[,] . . . the obvious but judgment-proof and absent defendant." J.A. 499.

## II.

Partington first claims that the district court erred in granting summary judgment against him on the basis that he lacked standing to sue for the alleged sales of unregistered securities. Reviewing this determination *de novo* and construing the evidence in the light most favorable to Partington, *see Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), we conclude that the district court's decision was correct. Accordingly, we hold that Partington lacks standing under section 77l, both in his individual capacity and for the benefit of the Partington Trust, to recover against appellees.

### A.

Section 77l provides, in relevant part, that "[a]ny person who . . . offers or sells a security in violation of section 77e of this title . . . shall be liable . . . to the *person purchasing such security from him* . . . ." (emphasis added). As did the district court, we will assume, without deciding, that the notes and viaticals were securities for the purpose of section 77l. Appellees do not contest that these securities were sold without the registration required by section 77e. Nevertheless, under the plain language of section 77l, Partington cannot recover unless he is a "person purchasing such securit[ies]" as defined in this provision.

There is no allegation that Partington himself actually purchased these securities. To the contrary, Charterhouse, as trustee, purchased the viatical contracts and the note for the benefit of the Partington Trust. Instead, Partington's theory below was that he was the beneficiary of the Partington Trust, and since funds from that trust were used to purchase the securities for the benefit of that trust, he should be considered a "person purchasing" those securities. The district court, however, concluded that, even assuming that an equitable beneficiary can be a purchaser for the purpose of section 77l, Partington was not the trust beneficiary "in a legal sense," J.A. 502 — a conclusion Partington deems "hypertechnical." Opening Br. of Appellant at 20.

We recognize that other courts have, with respect to section 10(b) of the Securities Exchange Act of 1934 and S.E.C. Rule 10b-5,

accorded a flexible construction to the determination of who is a purchaser or seller to avoid "taking a technical, unrealistic view of what happened in a case." *Grubb* v. *Federal Deposit Ins. Corp.*, 868 F.2d 1151, 1162 (10th Cir. 1989); *see also Norris* v. *Wirtz*, 719 F.2d 256, 261 (7th Cir. 1983) (holding that beneficiary of trust from which executors sold securities had standing under section 10(b) and rule 10b-5).[5] We need not decide, however, whether trust beneficiaries can be "person[s] purchasing" under section 77l, because the district court correctly concluded that, even if this were true, Partington was not a beneficiary of the Partington trust.

In reaching this conclusion, we look to the terms of the original trust agreement, which is the version in place at the time of the relevant purchases. The trust agreement is "by and between" Shallowford and Charterhouse alone, and its stated purpose is to provide *Shallowford* with "a source of funds to assist it in meeting its obligations" to Partington. J.A. 428. And most importantly, the trust agreement

---

[5]The precise relevance of this and other rule 10b-5 cases cited by Partington in arguing for a flexible definition of "person purchasing" in section 77l is unclear. The statutory language for rule 10b-5 is relatively broad — "prohibiting fraudulent or manipulative conduct '*in connection with* the purchase or sale of any security,'" 17 C.F.R. § 240.10b-5 (2003) (emphasis added) — and a purchaser/seller requirement has been judicially imposed. *See Blue Chip Stamps* v. *Manor Drug Stores*, 421 U.S. 723 (1975) (adopting the rule of *Birnbaum* v. *Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952), and holding that private damages actions under rule 10b-5 are confined to actual purchasers or sellers of securities). Given this, it is understandable why courts dealing with rule 10b-5 cases might occasionally employ a definition of purchaser which is broader than its plain meaning to maintain consistency with the broader statutory terminology. As to section 77l, however, the requirement that a plaintiff be a "person purchasing" the security is itself imposed by statute, and we have significantly less reason to go beyond the plain meaning of that phrase. In this respect, we take instruction from *Pinter* v. *Dahl*, 486 U.S. 622 (1988), in which the Supreme Court stated that "[t]he broad remedial goals of the Securities Act are insufficient justification for interpreting a specific provision more broadly than its language and the statutory scheme reasonably permit. We must assume that Congress meant what it said." *Id.* at 653 (rejecting an overly-broad definition of "seller" in section 77l) (internal quotation marks and citations omitted).

explicitly disavows any beneficial interest in the trust by Partington. The trust agreement specifies that "Plan participants [*i.e.*, Partington] and their beneficiaries shall have no preferred claim on, *or any beneficial ownership interest in*, any assets of the Trust." J.A. 428 ¶ 1(d) (emphasis added).[6] If that were not clear enough, the agreement goes on to define the rights Partington retains under both the trust agreement and the deferred compensation plan as follows: "*Any rights* created under the Plan(s) *and* this Trust Agreement *shall be mere unsecured contractual rights of Plan participants* [*i.e.*, Partington] *against the Congregation* [*i.e.*, Shallowford]." *Id.* (emphasis added). That the trust proceeds were to be paid directly to Partington rather than to Shallowford appears to be, in light of the above, no more than a matter of expediency, and does not enlarge Partington's rights beyond these limitations.

B.

Partington dismisses these trust provisions as mere "legal disclaimers," Opening Br. of Appellant at 25, without appreciating that they disclaim his status as a beneficiary of this trust. That said, it is unsurprising that Partington has apparently retreated from the position he took below, contending at oral argument, for example, that while Westminster (as successor to Shallowford) was the "*de jure* beneficiary" of the Partington Trust, he was the trust's "*de facto* beneficiary," and thus he should still be considered a "person purchasing." To justify this label, he contends that it was his funds that were used to purchase the investments, it was he who made the decisions to invest in the viaticals and note, and it is he alone that feels the loss of assets in the Partington Trust.

Even when viewed through this lens, however, Partington is not a "person purchasing." We first note that at the time of the purchases,

---

[6]Whether by mistake or otherwise, Partington erroneously claims that the district court in fact relied on the revised rabbi trust agreement, which also contains this language, rather than the language of the original agreement, which he claims does not. But in this respect, the two agreements are identical in terms, if not in structure, and the paragraph cited by the district court (¶ 1(d)) only contains this language in the original agreement (the disclaimer is in ¶ 1(e) of the revised version).

the money used to make these investments was not Partington's, but instead belonged to the trust and was subject in its entirety to the claims of Shallowford's creditors. But to the extent the factors Partington mentions are relevant at all to whether he is a "person purchasing," the dominant one must be the second — Partington's assertion that he made the relevant investment decisions.

We conclude that Partington did not, however, actually make these decisions *because he had no control over trust investments*. The trust agreement specifies, under the heading "Investment Authority," that "[a]ll rights associated with assets of the Trust shall be exercised by Trustee or the person designated by Trustee, *and shall in no event be exercisable by or rest with Plan participants*." J.A. 430 ¶ 5. Partington's lack of legal authority in this regard is important because, whether we label him a *de facto* beneficiary (his terms) or simply a plan participant (the trust agreement's terms), Partington still must be a "person purchasing" under section 77l in order to prevail. Although the lack of investment authority may not be dispositive in the determination of who is a "person purchasing," we must conclude that Partington, a person who did not actually make the relevant purchases, who did not own the funds used for the purchases, who was not a beneficiary of the trust for which the purchases were made, *and* who lacked any authority to control the purchasing decisions, is *not* a "person purchasing" under section 77l. That in this case *Charterhouse* chose, in the exercise of *its* investment authority, to consult Partington on these decisions and follow his direction, does not alter our conclusion. Rather, and as the district court concluded, the actual "person purchasing" for the transactions from which Partington alleges injury is likely Centura Bank (as successor trustee to Charterhouse) or Westminster (as successor beneficiary to Shallowford).

As might be expected, the cases cited by Partington lend no support to his position, and at least one case militates directly against it. For example, Partington relies on the Seventh Circuit's decision in *Norris*, a section 10(b) and rule 10b-5 case which involved a plaintiff who was beneficiary of a testamentary residuary trust to be funded by the assets remaining after the closing of her father's estate. 719 F.2d at 257. Allegedly, the trustees had fraudulently induced the plaintiff to authorize a particular securities transaction involving the sale of estate assets to companies controlled by the trustees. *Id*. In holding that the

plaintiff stated a cause of action under section 10(b) and rule 10b-5, the court reasoned that "*[b]ecause we believe plaintiff's approval was required under the will*, plaintiff fits within the contours of the *Birnbaum* rule" requiring a plaintiff bringing an action for securities fraud under those provisions to be an actual purchaser or seller. *Id*. at 259. (emphasis added). Thus, *Norris* turned on the very investment authority that Partington lacks, and suggests only why Partington is *not*, in his individual capacity, a "person purchasing."

### C.

Partington has also failed to establish that he has standing to sue for the benefit of the Partington Trust. The case cited by Partington that is most favorable to him on this issue appears to be *Brink* v. *DaLesio*, 667 F.2d 420 (4th Cir. 1981), which stated the "general rule" that "a beneficiary or one suing on his behalf can maintain a suit against the trustee to enforce the trust or to enjoin or obtain redress for a breach of trust." *Id*. at 428. Even if a section 77l claim under these circumstances can be construed as one to enforce the trust or respecting a breach thereof, *Brink* would suggest that this claim would lie, if at all, with Westminster, the equitable beneficiary, or one suing on Westminster's behalf. Partington has not demonstrated that he has standing to assert such a claim absent the court's acceptance of Westminster's ratification of his action. *See infra* at 27.

### III.

We turn next to appellants' argument that the district court erred in denying their motions for permissive intervention because the court concluded that appellants were not members of the class Partington sought to certify, and thus their claims were not entitled to equitable tolling. This assertion of error requires us to decide whether, and to what extent, evidence outside of the complaint can be used to construe a definition of a plaintiff's asserted class that is more narrow than what the complaint alone would dictate for the purposes of determining a party's entitlement to tolling. We conclude that consideration of such evidence is proper, and that under the facts here, the district court did not err in adopting a more narrow definition of Partington's asserted class and, accordingly, denying the motions for intervention.

## A.

In concluding that appellants were not members of the class Partington sought to certify, the court first examined Partington's complaint, which defined a "class consist[ing] of persons "*on behalf of whom* [Charterhouse] and/or its agents purchased viatical settlements and/or [notes]." J.A. 25 ¶ 20, 630 (emphasis added). The court reasoned that the "on behalf of whom" language suggested "that the class was to consist of trust beneficiaries, not direct purchasers." J.A. 630. While conceding the uncertainty of this determination, the court explained that its decision was clarified by the fact that "the Plaintiff's attorneys represented to the Court that the Plaintiff sought to represent a class of 'members of the clergy on behalf of whom Charterhouse created and/or administered a so-called "rabbi trust."'" *Id.* (quoting Plaintiff's Memorandum in Support of Motion for Class Certification). Thus, the court concluded, at least as of June of 2000 (the month that motion was filed), "the [asserted] class consisted of preachers whom the Plaintiff *mistakenly* thought were the legal beneficiaries of the 'rabbi trusts' their churches had established." *Id.* (emphasis added).

The court then added that "the parties proceed for two years on the assumption that this was an action in which preachers" having a relationship to a rabbi trust "were the plaintiffs," not "churches and other plaintiffs as well." J.A. 630. In light of these facts, the court concluded that appellants were not members of the asserted class, and thus their claims were not entitled to equitable tolling. Given that the statute of limitations for appellants' federal securities claims was one year, the court concluded that those claims, even if once viable, were now time-barred. While expressing "genuine sympathy" for the ministers involved, the court denied permissive intervention.

## B.

Typically, a decision to deny permissive intervention under Rule 24(b) "lies within the sound discretion of the trial court." *Hill* v. *Western Elec. Co., Inc.*, 672 F.2d 381, 386 (4th Cir. 1982). But the denial of permissive intervention because a party's claim was not entitled to equitable tolling, and thus was barred by the statute of limitations, is not necessarily the exercise of discretion. *See American Pipe &*

*Const. Co.* v. *Utah*, 414 U.S. 538, 560 (1974) (holding that a district court's decision that attempted intervenors' claims were not entitled to tolling, and thus were absolutely barred by the statute of limitations, was a conclusion of law). Instead, to the extent a challenge to the denial of tolling "is not to the existence of certain facts, but instead rests on whether those facts demonstrate a failure to bring a timely claim, resolution [of this challenge] . . . turns on questions of law which are reviewed *de novo*." *Franks* v. *Ross*, 313 F.3d 184, 192 (4th Cir. 2002) (internal quotation marks and alterations omitted). Accordingly, even in the context of motions for permissive intervention, "[w]e have plenary review of the district court's choice and interpretation of applicable tolling principles and its conclusion that the facts [did not give] rise to a tolling of the statute of limitations." *Nelson* v. *County of Allegheny*, 60 F.3d 1010, 1012 (3d Cir. 1995) (internal quotation marks omitted). However, as to all circumstances other than "where the relevant facts are undisputed and the district court denied equitable tolling as a matter of law," we review the denial of tolling below for abuse of discretion. *Rouse* v. *Lee*, 339 F.3d 238, 247 n.6, 248 (4th Cir. 2003) (*en banc*) (stating that abuse of discretion is our standard of review for tolling decisions "[i]n the non-habeas context").

## C.

In *American Pipe*, the Supreme Court held that, at least in certain circumstances, "the commencement of a class action suspends the applicable statute of limitations *as to all asserted members of the class* who would have been parties had the suit been permitted to continue as a class action." 414 U.S. at 554 (emphasis added). Thus, even though a plaintiff's desired class has been denied certification, parties who were putative members of that class may file timely motions for intervention after that denial and be eligible to have the statute of limitations tolled on their claims for the period between the initiation of the original suit and the denial of class certification. *See Crown, Cork & Seal Co., Inc.* v. *Parker*, 462 U.S. 345, 354 (1983). Although *American Pipe*'s holding was limited to the denial of class certification for failure to show "the class is so numerous that joinder of all members is impracticable," 414 U.S. at 552-53, the *Crown, Cork & Seal* court appears to have untethered this tolling rule from any necessary connection to the reasons for denying certification. *See* 462 U.S.

at 353-54 (applying *American Pipe* tolling rule without qualification as to the grounds for denial of class certification). And of particular relevance here, we have held that persons who were members of the named plaintiff's asserted class as to a certain type of claim were entitled to tolling on claims of that type even when the named plaintiff himself was not such a member. *See Lilly* v. *Harris-Teeter Supermarket*, 720 F.2d 326, 334 & n.13 (4th Cir. 1983). We therefore see no reason in this case to say that Partington's lack of a viable federal claim prevents those appellants who are members of his asserted class, and who might have viable individual claims, from obtaining the benefit of tolling. But those appellants first must have been members of the class Partington sought to have certified. *See In re Syntex Corp. Securities Litigation*, 95 F.3d 922, 936 (9th Cir. 1996) (denying equitable tolling to the claims of plaintiffs who were not "asserted class members," but instead "wanted to expand the class in order to become class members").

Accordingly, the first question we must decide is whether the district court correctly construed Partington's asserted class to include only ministers on behalf of whom Charterhouse created and/or administered rabbi trusts. As to this point, appellants argue that the district court incorrectly defined the class more narrowly than the complaint requires, implicitly assigning error to the district court's use of the narrow class definition asserted by Partington when moving for class certification. Of course, we need not examine whether the district court abused its discretion as to its factual conclusions about the arguments made and positions taken by Partington after filing his complaint until we decide whether we can look beyond the complaint at all.

Admittedly, we usually look to the complaint to determine the scope of a plaintiff's asserted class for tolling purposes. *See*, *e.g.*, *Davis* v. *Bethlehem Steel Corp.*, 769 F.2d 210, 212 (4th Cir. 1985) ("It is, of course, in the Lane complaint where we search for notice to Bethlehem and the Unions" sufficient to invoke *American Pipe* tolling.). As for the complaint here, its class definition, which included persons "on behalf of whom" Charterhouse and/or its agents purchased the contracts or notes, would encompass those attempted intervenors who were rabbi trust beneficiaries (*e.g.*, churches like Westminster who funded the trusts), and arguably those who were

direct purchasers (*e.g.*, ministers who purchased securities outside of the rabbi trust context with the assistance or advice of Charterhouse or its agents), depending perhaps on how the transactions were carried out. Liberally construed, it might also include those who were rabbi trust "plan participants" like Partington, and thus, at best, *de facto* beneficiaries of any purchases by Charterhouse. So were we to rely on the complaint alone, we would likely conclude that the district court was at least partially in error in defining Partington's asserted class.

We are not, however, confined to examine *only* the complaint in determining the scope of the class Partington sought to certify. The scope of a plaintiff's asserted class for tolling purposes is that class for which there was "fair notice" as to both "the substantive claims" and the "number and generic identities of the potential plaintiffs" that might "participate in the judgment" if the plaintiff's desired class was, in fact, certified. *Davis*, 769 F.2d at 212. In performing this analysis, we can consider evidence outside of the complaint that demonstrates the extent of the class the plaintiff represented to the district court that he desired to have certified — especially when the complaint itself is unclear. *See McCarthy* v. *Kleindienst*, 562 F.2d 1269, 1274 (D.C. Cir. 1977) ("In determining [for tolling purposes] whether the function of the statute of limitations has been served, it may be necessary to go beyond the facts of the complaint . . . .").

Indeed, the Tenth Circuit has held that where plaintiffs move for class certification by unambiguously asserting a class definition more narrow than that required by their complaint, their asserted class for tolling purposes is that more narrow definition. *See Sawtell* v. *E.I. du Pont de Nemours and Co., Inc.*, 22 F.3d 248, 254 (10th Cir. 1994). In *Sawtell*, plaintiffs in Minnesota filed three separate class actions involving product liability claims against du Pont. Although the original complaints did not limit the class to consumers from any particular state, "when the [Minnesota] plaintiffs moved for class certification a month later," they asked for a class of "those who received the Proplast/Teflon Interpositional Implant *in Minnesota*"; at that point, "the narrowness of the class definitions was clear." *Id.* at 253 (emphasis added). The court reasoned that Sawtell, who both resided and had her implants installed in New Mexico, was outside of the class the Minnesota plaintiffs sought to certify, and thus would

not have been a party to the Minnesota suits "had the suit been permitted to continue as a class action." *Id.*

We believe that the *Sawtell* court employed the correct rule, and conclude that when a plaintiff moves for class certification by asserting an unambiguous definition of his desired class that is more narrow than is arguably dictated by his complaint, his asserted class for tolling purposes may be limited to that more narrow definition. It then follows that for parties outside that asserted class, tolling will be unavailable at least until such time as the plaintiff repudiates that definition of the class he seeks to have certified in a manner that provides adequate notice that his class definition has changed.

### D.

Applying this rule to the instant case, if the district court did not abuse its discretion as to its conclusions about the arguments Partington made during his motion for class certification and the positions he took thereafter, we believe that the district court would have properly construed the scope of Partington's asserted class, as of June 2000 through the end of the litigation, as being limited to ministers on behalf of whom Charterhouse created and/or administered rabbi trusts. However, before making that conclusion final, we must first address appellants' apparent challenge to the factual conclusions on which that construction was based,[7] and decide if any of those conclusions were an abuse of discretion. We conclude that, in all meaningful respects, they were not.

While Partington's memorandum in support of his motion for class certification is not in our record, the district court was undoubtedly correct in its conclusion that Partington, in that memorandum,

---

[7]Appellants do not explicitly challenge the district court's factual conclusions as to the scope of the class Partington asserted when moving for class certification and maintained throughout litigation, but in light of their argument that there "was no logical reason" why the district court would have construed the asserted class more narrowly than in the complaint, and given appellants' contention at oral arguments that the class Partington sought to certify was not just limited to clergy, we will assume appellants assign error to these conclusions.

unequivocally defined his class so as to include *only* ministers on behalf of whom Charterhouse created and/or administered rabbi trusts.[8] There is more doubt, however, as to whether the district court's conclusion that Partington maintained this definition for almost two years thereafter was an abuse of discretion. In particular, the filing of the first motion to intervene on July 27, 2001 (which was signed by Partington's attorneys, though at the time not in their capacity as such) arguably repudiated that narrow class definition, requesting, as it did, intervention by persons who had no connection to rabbi trusts, both in their individual capacities and as class representatives.

We need not answer the question as to whether the district court was correct in its conclusion that Partington maintained the narrow class definition for the entire time from the date the suit was filed until the date the suit was dismissed, however, because even if the district court were incorrect that Partington maintained the narrow class definition for this entire two year period, it is clear that Partington did maintain this class for at least a period of one year before the first motion to intervene was filed. Specifically, appellants have not shown error in the district court's implicit conclusion that Partington maintained his narrow class definition at least from the time of his memorandum in support of his motion for class certification filed in June 2000, in which he limited the definition of his class to ministers on behalf of whom Charterhouse created and/or administered rabbi trusts, until at least the first motion for intervention was filed in July 2001, over one year later. Moreover, the transactions of which appellants complain all occurred more than one year before the filing of the first motion to intervene, a time longer than the statute of limitations

---

[8]During the hearing on the motions for intervention, Mr. Macintyre, counsel for one of defendants, stated that Partington's memorandum in support of his motion for class certification asserted that "*each of the class members* is a member of the clergy on behalf of whom Charterhouse created and/or administered a so-called Rabbi Trust . . . ." J.A. 858 (emphasis added). Mr. Bloss, Partington's counsel, initially argued that this was language from a separate action, but after being shown the document that Mr. Macintyre stated he had read from "verbatim," Mr. Bloss said: "Thank you. I apologize, Your Honor. *He's correct. Way back when, I think that's what we thought was going on with everybody in the class.*" J.A. 859 (emphasis added).

for appellants' section 77l claims. *See* 15 U.S.C. § 77m (2000) (requiring an action "to enforce a liability created under section 77l(a)(1)" to be "brought within one year after the violation upon which it is based"). Therefore, unless appellants were within Partington's narrow class definition — a definition that Partington maintained between June 2000 and, at minimum, July 2001 — and thus were entitled to equitable tolling of the statute of limitations on their claims *for at least that period*, the statute of limitations governing appellants' section 77l causes of action against defendants and appellees would have run.

We conclude that appellants were not within that narrow class definition. For one, appellants have not asserted that any of the natural persons seeking intervention were members of the clergy having a connection with a rabbi trust.[9] As for the two churches that sought intervention, Westminster and Draper Valley Baptist Church, we merely note that churches are not "members of the clergy" despite the close connection between the two, and conclude that there was not adequate notice that these churches were within Partington's asserted class.[10] As a result, any error by the district court as to the class definition maintained by Partington *after* that first motion for intervention was harmless.

We therefore hold that because appellants were not members of the class Partington sought to have certified for over a year prior to their seeking intervention, their section 77l claims were not entitled to tolling for that period and, consequently, were time-barred. Thus, the dis-

---

[9]Allen E. Smith, who moved for intervention on July 27, 2001, would appear to be one exception. He claimed to be the beneficiary of a rabbi trust similar in all respects to Partington's, and thus arguably was within Partington's asserted class. But appellants do not raise this issue, and if Smith's rabbi trust was structured the same way as Partington's, Smith also would have lacked standing.

[10]This question is made slightly more complex as to Westminster by appellees' concession at oral argument that, "using our imaginations, we could have" determined that churches, and in particular Westminster, were the proper party plaintiffs. But simply because appellees *could* have determined that Westminster may have had a viable claim against them does not mean that Westminster was part of *Partington's asserted class*.

trict court's denial of appellants' motions for permissive intervention was proper.

## IV.

We have considered the other claims presented by Partington, and have concluded that no extended discussion of them is necessary. First, we hold that the district court did not abuse its discretion by failing to accept ratification of Partington's action by Westminster or by failing to allow substitution by Westminster for Partington under Federal Rule of Civil Procedure 17(a). Although on February 8, 2002, Partington filed with the court a letter indicating that Westminster, the putative real party in interest, had ratified his action, Partington has not shown that he either formally or informally asked the court to accept Westminster's ratification of the action. Partington also never filed a formal motion for substitution, although he did appear to informally request substitution during the May 13, 2002 hearing on the motions to intervene. *See* J.A. 896-98. But even if he did sufficiently request acceptance of ratification or substitution, given that these requests were made (at the earliest) over sixteen months after an objection that Charterhouse, not Partington, was the real party in interest, *see* J.A. 647 (motion to dismiss hearing on September 19, 2000), and without any compelling reason why acceptance of ratification or substitution was not requested earlier, we cannot say that the district court abused its discretion in either regard.

Finally, because we agree with the district court that Partington "d[id] not himself state a claim," we hold that the district did not abuse its discretion in denying class certification on the grounds that "[Partington's] position would not then be typical of anyone (for instance, direct purchasers) who did state a claim," J.A. 503, nor by concluding that, even if the action were brought by the proper party plaintiff, a class action would not be "superior to other available methods for the fair and efficient adjudication of the controversy." J.A. 504.

## *CONCLUSION*

Although the predicaments alleged by Partington and appellants are, if true, quite unfortunate, we must conclude that the district court

did not commit reversible error. For the reasons stated herein, the judgment of the district court is affirmed.

*AFFIRMED*