**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

KEVIN ANGELO SIMMONS,
*Plaintiff-Appellant*,

v.

G. ARNETT; ROMO, Sgt, individual capacity; M. LOPEZ, Nurse, individual capacity,
*Defendants-Appellees*.

No. 20-55043

D.C. No.
2:16-cv-02858-
R-KES

OPINION

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted April 14, 2022
Pasadena, California

Filed August 31, 2022

Before: Consuelo M. Callahan and Lawrence VanDyke,
Circuit Judges, and Janet Bond Arterton,[*] District Judge.

Opinion by Judge Callahan;
Partial Concurrence and Partial Dissent by Judge Arterton

---

[*] The Honorable Janet Bond Arterton, United States District Judge for the District of Connecticut, sitting by designation.

**SUMMARY**[**]

**Prisoner Civil Rights**

The panel affirmed the district court's summary judgment for defendants in an action brought by a California state prisoner alleging excessive force and deliberate indifference to medical needs.

Defendant G. Arnett, a prison guard, shot plaintiff Kevin Simmons with three sponge-tipped plastic rounds during a prison fight, breaking Simmons's leg and injuring his butt and thigh. Following the fight, prison nurse M. Lopez assessed Simmons's injuries and transferred him to an emergency room without fully completing her notes or conducting a full body examination.

The panel first held that the district court correctly concluded that there was no constitutional violation. Arnett's decision to shoot Simmons with sponge rounds was not an excessive use of force. He had a duty to keep prison staff and the prisoners in his care safe and he used the lowest level of force available to him. Even viewing the record in the light most favorable to Simmons, there was no evidence showing that Arnett had any improper motive, let alone that he acted "maliciously and sadistically for the very purpose of causing harm." As to defendant Lopez, rather than deliberate indifference, her actions seemed to reflect the conduct of a medical professional who quickly and successfully ensured that her patient received the appropriate level of care. Even assuming that defendants somehow may

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

have violated the Eighth Amendment, their actions could not be characterized as violating some clearly established principle of constitutional law. Defendants were therefore entitled to protection under the doctrine of qualified immunity and summary judgment was properly entered in their favor.

Concurring in part and dissenting in part, Judge Arterton concurred with the majority's conclusion that the district court's grant of summary judgment in favor of Nurse Lopez should be affirmed on the view that her conduct did not rise to the level of deliberate indifference. Judge Arterton respectfully dissented, however, from the majority's grant of qualified immunity to Officer Arnett. Specifically, she was troubled by the majority's determination that Arnett's actions did not violate clearly established law, and its decision to rule on qualified immunity while key facts were still in dispute.

**COUNSEL**

Michael D. Seplow (argued), Schonbrun Seplow Harris Hoffman & Zeldes LLP, Culver City, California; David Wilson (argued) and Jonathan Widjaja (argued), Certified Law Students, University of California School of Law, Irvine, California; Peter Afrasiabi, One LLP, Newport Beach, California; for Plaintiff-Appellant.

Cassandra J. Shryock (argued) and Kevin Voth, Deputy Attorneys General; Neah Huynh, Supervising Deputy Attorney General; Monica N. Anderson, Senior Assistant Attorney General; Rob Bonta, Attorney General; Office of the Attorney General, San Francisco, California; for Defendants-Appellees.

## OPINION

CALLAHAN, Circuit Judge:

A prison guard shot inmate Kevin Simmons with three sponge-tipped plastic rounds during a prison fight, breaking Simmons's leg and injuring his butt and thigh. Following the fight, a prison nurse assessed Simmons's injuries and transferred him to an emergency room without fully completing her notes or conducting a full body examination. Simmons later filed this lawsuit against the guard and the nurse, alleging that they had violated his rights under the Eighth Amendment to the U.S. Constitution. The district court entered summary judgment against Simmons, finding that even when viewing all the evidence in the light most favorable to Simmons, the guard and nurse had not violated his constitutional rights. Simmons now appeals.

We affirm the district court. The district court correctly concluded that there was no constitutional violation. We further hold that the guard and nurse are protected by the doctrine of qualified immunity, which protects government officials from civil liability when they are accused of violating constitutional rights that are not clearly established.

## BACKGROUND

### I.  The Prison Fight

Simmons is 57 years old and has spent much of his life in prison. For the past 11 years, he has been serving a life sentence without the possibility of parole at California State Prison, Los Angeles County, a large facility in the Mojave Desert, just north of Los Angeles. During this incarceration—his second at the facility—Simmons found

work as a prison barber. Five days a week, he went to each of the prison's five buildings to give haircuts to inmates.

Simmons intended to work on Thanksgiving Day 2013. When he arrived at his assigned building that morning, nothing appeared out of the ordinary. A lone guard sat in a control booth overlooking the two floors of prison cells and the common yard, where sixteen to eighteen inmates gathered. Simmons recognized some of the inmates in the yard as members and associates of a gang known as the Two-Fivers, including an associate named Salvador Murillo.

Simmons asked the guard in the control booth if he could walk around the cells and sign inmates up for haircuts. The guard assented. Simmons then heard several Two-Fivers ask the guard if they could sit together at a table in the common yard. The guard agreed to this as well. Sign-up sheet in hand, Simmons began his rounds on the building's second floor. He had climbed up the stairs and was chatting with another inmate when the yard below went quiet.

A sudden commotion ended the momentary silence. Simmons looked down at the yard, where Two-Fivers were punching and slapping Murillo—not at full force, but hard enough that Murillo had, in Simmons's words, "his nose and his mouth busted." After about twenty-five or thirty seconds, the guard in the control booth told the inmates to stop "horse-playing." The scuffle stopped.

Bloodied, Murillo crossed the yard and climbed stairs to the second floor, where Simmons was speaking with another inmate. Murillo walked past Simmons, then suddenly turned around and struck him in the head, right above his left ear. Murillo continued to hit Simmons, who says he did not fight back.

The guard in the control booth—Garth Arnett—immediately responded to the fight. He activated the building alarm and announced on the prison-wide radio that two inmates were fighting. Typically, prison staff responded to such calls for help within thirty to forty-five seconds. Arnett says he ordered Murillo and Simmons to stop fighting, although Simmons says he heard no such command.

At this point, Arnett's choices were limited. Prison policy forbade him from leaving the control booth because it would then be unmanned. But staying in the booth and doing nothing could result in severe injury or death to Simmons, Murillo, or other inmates who might join the fighting. In the booth, Arnett had two weapons that he could use to try to stop the fight: (1) a Mini-14, a semiautomatic rifle that shot live rounds with deadly force, and (2) a 40mm launcher that shot less-lethal sponge rounds, high-speed projectiles consisting of plastic bodies and foam noses.

Arnett chose to use the 40mm launcher. Because Simmons was between Arnett and Murillo, Arnett could not shoot Murillo. Arnett fired a round at Simmons from about 10 yards away, aiming for Simmons's legs and avoiding his groin, consistent with protocol for use of the launcher. The round hit and broke Simmons's left leg. Arnett says that he kept ordering the two inmates to stop fighting, without any success. Arnett fired two more rounds at Simmons, hitting him in his butt and thigh. After Arnett fired the third round—about thirty to forty-five seconds after he had sounded the alarm—other prison staff arrived and Murillo and Simmons immediately laid prone and stopped fighting.

## II. The Fight's Aftermath

Prison staff immediately took Simmons on a gurney to the prison's medical room to receive medical care. There, Simmons met Michelle Lopez, a licensed vocational nurse on duty that day. Lopez asked Simmons what had happened to him. Simmons answered, "no comment." Lopez transcribed this response onto her forms. One of the other prison staff noticed that Simmons's pants were wet and commented on them. Simmons then told Lopez that he "sat in some water." Lopez crossed out her previous comments and wrote that Simmons had "slipped in water." Eventually, Simmons told Lopez that he had been shot on his backside. On her forms, Lopez wrote that Simmons had lower leg pain, but she did not record any other injuries. Lopez quickly recognized that Simmons needed a higher level of medical care and had him transferred to the prison's emergency room. The forms Lopez filled out were not sent with Simmons nor did they establish the basis for his treatment. Prison officials stabilized Simmons's leg, gave him pain medication, and transported him to a local hospital. There, he was diagnosed with a fractured leg, which was surgically repaired the next day. Simmons's butt and thigh were not treated until three days after Lopez examined Simmons. By then, Simmons says, his bloodied clothing had dried into his wounds such that it had to be painfully torn away. Simmons was then discharged, but he has permanent nerve damage and now walks with a cane.

## III. This Lawsuit

A few years after the fight, Simmons filed this civil rights lawsuit in federal court. In the operative complaint, Simmons alleges that Arnett and Lopez violated his Eighth Amendment rights. Arnett and Lopez moved for summary

judgment. The district court granted their motion and entered judgment against Simmons. Now Simmons appeals.

## LEGAL STANDARDS

We have jurisdiction to review the district court's grant of summary judgment and entry of judgment because they are the district court's final decisions. *See* 28 U.S.C. § 1291. We review an order granting summary judgment de novo but can affirm on any ground supported by the record, even when the district court did not address that same ground. *Geurin v. Winston Indus., Inc.*, 316 F.3d 879, 882 (9th Cir. 2002); *Venetian Casino Resort, LLC v. Local Joint Exec. Bd.*, 257 F.3d 937, 941 (9th Cir. 2001). We affirm a grant of summary judgment if "there is no genuine dispute as to any material fact" when viewing the record in the light most favorable to the nonmoving party, such that the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is one that is needed to prove (or defend against) a claim, as determined by the applicable substantive law. *Nat'l Am. Ins. Co. v. Underwriters*, 93 F.3d 529, 533 (9th Cir. 1996).

## DISCUSSION

The applicable substantive law in this case is rooted in the Eighth Amendment, which commands that "cruel and unusual punishments [shall not be] inflicted" by the government. U.S. Const. amend. VIII. Simmons accuses Arnett and Lopez of violating this dictate: Arnett by using excessive force when quelling the fight between Murillo and Simmons and Lopez by being deliberately indifferent to

Simmons's medical needs following the fight. Arnett and Lopez both counter that they did not violate Simmons's constitutional rights.

Arnett and Lopez also raise the affirmative defense of qualified immunity, which protects government officials who violate constitutional rights from civil liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

We thus confront two questions. First, did Arnett's and Lopez's conduct violate Simmons's constitutional rights when viewing the facts alleged in the light most favorable to Simmons, the party asserting the injury? *CarePartners, LLC v. Lashway*, 545 F.3d 867, 876 (9th Cir. 2008). And second, was the relevant right clearly established at the time Arnett and Lopez acted, such that they would have (or should have) known to not violate it? *Id.* Arnett and Lopez are entitled to summary judgment if the answer to either question is "no."

## I. Violation of a Constitutional Right

We begin with the first question, just as the district court did. While Simmons accuses both Arnett and Lopez of violating the same constitutional provision—the Eighth Amendment—separate standards apply to Simmons's claim against Arnett and Simmons's claim against Lopez given the nature of the challenged conduct.

### A. Arnett Did Not Violate Simmons's Constitutional Rights

To sustain his excessive force claim against Arnett, Simmons must show, among other things, that Arnett's actions were not "a good faith effort to maintain or restore discipline," and that Arnett instead acted "maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). In *Whitley*, the Supreme Court identified some of the factors that courts should look to when assessing whether this standard has been satisfied. These include the need for application of force, the relationship between the need for force and the amount of force used, any effort made to temper the severity of the force used, and the extent of the threat to the safety of staff and inmates. *Id.* at 321–22. Courts have recognized that prison officials should be accorded "wide-ranging deference" when they are exercising their judgment to maintain prison safety. *See id.*; *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). In the specialized context of prison operations, the use of force can be a "legitimate means for preventing small disturbances from becoming dangerous to other inmates or the prison personnel." *Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979).

The district court correctly held that when these factors are viewed through an appropriately deferential lens and applied to the facts of this case, Arnett's decision to shoot Simmons with sponge rounds was not an excessive use of force. It is undisputed that Arnett was the only guard in the control booth and that he saw a fight break out. It is similarly uncontroverted that Arnett had a duty to keep prison staff and the prisoners in his care safe and that the fight between Simmons and Murillo could threaten that safety. And

Simmons does not dispute that Arnett was not permitted to leave the control booth, that he used the lowest level of force available to him, and that Simmons was between Arnett and Murillo. Even when the record is viewed in the light most favorable to Simmons, there is no evidence in the record showing that Arnett had any improper motive, let alone that he acted "maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320–21 (quoting *Johnson*, 481 F.2d at 1033). These undisputed facts make clear that Arnett did not violate Simmons's Eighth Amendment rights and as such, Arnett is entitled to summary judgment.[1]

---

[1] The partial dissent disagrees. It argues that qualified immunity should be addressed post-trial, primarily because of two differences in Arnett's and Simmons's accounts of the fight: (1) whether Simmons fought back against Murillo and (2) whether Arnett acted with the requisite malice. According to the partial dissent, our conclusion rests on a view of the record that is favorable to Arnett rather than Simmons. The partial dissent offers three cases to show that in situations like this, qualified immunity should not be granted: *Martinez v. Stanford*, 323 F.3d 1178 (9th Cir. 2003), *Furnace v. Sullivan*, 705 F.3d 1021 (9th Cir. 2013), and *Hughes v. Rodriguez*, 31 F.4th 1211 (9th Cir. 2022).

The partial dissent's position does not survive scrutiny. Regarding the first difference, Simmons's testimony that he did not fight back does not ineluctably conflict with Arnett's testimony that he believed he saw both inmates throwing punches. To the degree that there is tension, our analysis explicitly adopts Simmons's telling. Regarding the second difference, the partial dissent urges that Simmons's assertion that Arnett acted with malice creates a material issue of fact. We disagree. Without corroborating evidence of animus—and here, there is none—Simmons's subjective assertion of Arnett's intent is insufficient. If this were not the case, a defendant could circumvent qualified immunity and force a case to trial simply by alleging the requisite malice. The three cases cited by the partial dissent—*Martinez*, *Furnace*, and *Hughes*—are too factually dissimilar to be helpful here, as might be suggested by Simmons's decision to not cite to any of them.

**B. Lopez Did Not Violate Simmons's Constitutional Rights**

To sustain his inadequate medical care/deliberate indifference claim against Lopez, Simmons must show among other things, that Lopez "*purposefully* ignore[d] or fail[ed] to respond to [Simmons's] pain or possible medical need." *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992) (emphasis added), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997). Under this standard, an inadvertent failure to provide adequate medical care, differences of opinion in medical treatment, and harmless delays in treatment are not enough to sustain an Eighth Amendment claim. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). Even medical malpractice by itself would be insufficient to establish a constitutional violation. *Estelle*, 429 U.S. at 106. Instead, Simmons must show that Lopez acted with "subjective recklessness," analogous to how that phrase is used in criminal law. *Farmer v. Brennan*, 511 U.S. 825, 839 (1994).

Simmons does not come close to satisfying this standard as to Lopez, even accepting his allegations that Lopez erred when she (1) failed to conduct a full-body examination of Simmons as required by prison policy; (2) failed to properly document the wounds on his buttocks and thigh; and (3) "falsified" medical records by stating that Simmons sustained his injury by slipping in water. Lopez was presented with a recalcitrant inmate who was clearly injured but initially refused to cooperate in his own diagnosis. She nonetheless persisted in treating him. Perhaps realizing the urgency with which he needed additional treatment, she ensured that he was sent to the emergency room within

minutes of his arrival. Rather than deliberate indifference, these actions seem to reflect the conduct of a medical professional who quickly and successfully ensured that her patient received the appropriate level of care. She did not violate Simmons's constitutional rights and on that basis alone, she is entitled to summary judgment.

## II. Clear Establishment of the Right

We turn to the second question, asking whether the rights allegedly violated were clearly established such that a reasonable official would have (or should have) known to not violate them. While our findings that Arnett and Lopez did not violate Simmons's constitutional rights are sufficient to grant them summary judgment, the "clearly established" analysis confirms this conclusion. Further, this analysis is less fact-bound and more clear-cut than a determination of whether there has been a constitutional violation, which can involve mixed questions of law and fact. In contrast, "the 'clearly established' inquiry is a question of law that only a judge can decide." *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017).

For a right to be clearly established, the right must first "be defined at the appropriate level of specificity." *Dunn v. Castro*, 621 F.3d 1196, 1201 (9th Cir. 2010) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). Then the "[t]he contours of [that] right must be sufficiently clear that a reasonable official would understand that what [the official] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). There need not be "a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *Foster v. City of Indio*, 908 F.3d 1204, 1210 (9th Cir. 2018) (per curiam) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)). The plaintiff bears the burden

of proving that the right allegedly violated was clearly established at the time of the violation. *Moran v. Washington*, 147 F.3d 839, 844 (9th Cir. 1998).

### A.  Arnett is Entitled to Qualified Immunity

Although Simmons has the burden to show that the rights Arnett allegedly violated are clearly established, Simmons makes no effort to identify any relevant precedent in his opening brief or in his opposition to the motion for summary judgment below. In his reply brief, Simmons points to only two cases on this issue: *Marquez v. Gutierrez*, 322 F.3d 689 (9th Cir. 2003) and *Jeffers v. Gomez*, 267 F.3d 895 (9th Cir. 2001). At oral argument, Simmons's counsel identified *Marquez* as his strongest support for showing that the right at issue here was well-established. But we find that neither *Marquez* nor *Jeffers* placed Arnett on notice that he would be violating Simmons's constitutional rights through the conduct alleged in this case.

In *Marquez*, we held that under the standards applicable at summary judgment—that is to say, when viewing the facts in the light most favorable to the non-movant—a prison guard violated the Eighth Amendment when he shot live rounds at and broke the femur of "a passive, unarmed inmate standing near a fight between other inmates, none of whom was armed, when no inmate was in danger of great bodily harm." *Marquez*, 322 F.3d at 691–92. At a high level of abstraction, there are some similarities between those facts and the facts here—there was a prison fight, a prison guard shot a non-assailant, and the non-assailant's leg was broken.

But *Marquez* is materially distinguishable in at least two critical ways. First, Arnett did not fire at an inmate who was passively standing near a fight, and second, he did not shoot the inmate with live rounds. Instead, Arnett shot a sponge

round at an inmate who acknowledges that he was grabbing his assailant in the middle of a fight (though not punching back). The use of sponge rounds instead of live bullets is particularly important: to the extent *Marquez* provides guidance, it suggests that a prison guard should not shoot a fighting inmate with live rounds and should instead take "efforts to temper the severity of his response" and use less-lethal force—precisely what Arnett did when he used his 40mm launcher and sponge rounds instead of his semiautomatic rifle. *See id.* at 692. Nothing in *Marquez* put Arnett or any other reasonable officer in his position on notice that using less-lethal force to break up a prison fight would violate an inmate's constitutional rights. *Marquez* does not clearly establish the rights Simmons says were violated here.

*Jeffers* provides even less guidance. There, we held that two officers did not violate the Eighth Amendment when one of them accidentally shot an inmate during one of the largest prison disturbances in California history, involving between 150 and 200 inmates and lasting about 30 minutes. *Jeffers*, 267 F.3d at 901. Simmons does not explain how *Jeffers*—a case in which we did not find an Eighth Amendment violation—clearly establishes a right relevant to the facts of Simmons's case.

Simmons offers no other precedent to support his contention that the rights Arnett allegedly violated were clearly established and thus fails to satisfy his burden. That failure confirms that Arnett's actions are protected by

qualified immunity, even if we were to assume that they somehow may have violated the Eighth Amendment.**[2]**

## B.  Lopez is Entitled to Qualified Immunity

Simmons also fails to satisfy his burden to show that Lopez violated a clearly established right when she (1) failed to conduct a full-body examination of Simmons as required by prison policy; (2) failed to properly document the wounds on his buttocks and thigh; and (3) "falsified" medical records

---

**[2]** As noted, the partial dissent disagrees. While we have explained why remanding this case for trial is unwarranted, two practical points merit mention.

First, the partial dissent's suggested approach undercuts the purpose of qualified immunity. The doctrine is not just a shield from eventual civil liability. *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996). It exists to prevent the "distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service"—in sum, it exists to avoid requiring government officials to lead lives in limbo while a case is fully litigated over weeks, months, and years. *Harlow*, 457 U.S. at 816. Accordingly, the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (collecting cases). Adopting a wait-and-see approach here runs afoul of this fundamental principle.

Second and relatedly, the partial dissent does not offer an alternative course of action that would have protected Arnett from civil liability. Arnett's only other viable option was to effectively do nothing. But doing nothing seems likely to have led to serious injury or death, particularly when we accept Simmons's assertion that he was not fighting back. Given that prison officials have a duty to protect prisoners from violence at the hands of other prisoners, doing nothing likely also would have led to a lawsuit. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Denying Arnett qualified immunity for addressing in a moment a problem that no one has solved with years of time for deliberation appears to be inconsistent with the spirit of the doctrine.

by stating that Simmons sustained his injury by slipping in water.

Simmons relies on two cases to show that the right at issue was "clearly established"—*Gibson v. County of Washoe*, 290 F.3d 1175 (9th Cir. 2002), *overruled in part by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016), and *Gordon v. County of Orange*, 6 F.4th 961 (9th Cir. 2021)—but neither illuminates the issues here. Both cases relate to fatalities arising out of prison intake screenings that failed to identify behavioral health or substance use issues, situations far removed from the facts of this case. Here, Lopez was presented with a recalcitrant inmate who was clearly injured but initially refused to cooperate in his own diagnosis. She nonetheless persisted in treating him. Perhaps realizing the urgency with which he needed additional treatment, she ensured that he was sent to the emergency room within minutes of his arrival. Even accepting Simmons's assertions that Lopez did not take the time to conduct a full body examination nor correctly complete her notes in the face of his shifting stories about the cause of his injuries, Simmons fails to identify any materially similar case that would have served to put Lopez on notice that her conduct violated Simmons's clearly established rights, particularly since the notes at issue were not the basis of any future treatment. Instead, Lopez's actions seem to reflect the conduct of a medical professional who quickly and successfully ensured that her patient received the appropriate level of care. Lopez is thus entitled to protection under the doctrine of qualified immunity and summary judgment is properly entered in her favor.

## CONCLUSION

Accepting Simmons's well-plead allegations as true and drawing all inferences in his favor, we can sympathize with

him on his bad fortune and its lingering, long-term effects on his health. But such sympathy does not turn these events into constitutional violations. On the record before us, we cannot conclude that Arnett or Lopez violated Simmons's constitutional rights, nor can we characterize their actions as violating some clearly established principle of constitutional law. Indeed, the record reflects that both Arnett and Lopez took reasonable steps to address urgent situations in short periods of time. They are thus entitled to the protection offered by qualified immunity.

We **AFFIRM** the district court.

ARTERTON, District Judge, concurring in part and dissenting in part:

## I.

I concur with the majority's conclusion that the district court's grant of summary judgment in favor of Nurse Lopez should be affirmed on the view that her conduct did not rise to the level of deliberate indifference. I respectfully dissent, however, from the majority's grant of qualified immunity to Officer Arnett. Specifically, I am troubled by the majority's determination that Officer Arnett's actions did not violate clearly established law, and its decision to rule on qualified immunity while key facts are still in dispute. The majority's decision runs afoul of Ninth Circuit precedent requiring courts to settle factual disputes material to that inquiry before assessing a prison official's entitlement to qualified immunity as discussed below.

In my view, the qualified immunity analysis in this case depends on the resolution of the parties' two divergent

narratives. Simmons's version of events describes him as a passive victim, helpless to even find cover from an assault when Officer Arnett shot him three times. His account demonstrates a violation of his constitutional right to be free from force applied for the very purpose of causing harm. *See Whitley v. Albers*, 475 U.S. 312, 320–21 (1986). Additionally, viewing the specific context of the incident in the light most favorable to Simmons, his right was clearly established such that a reasonable prison guard in Officer Arnett's position would have been aware that his conduct was impermissible. *See Saucier v. Katz*, 533 U.S. 194, 202 (2001). But under Officer Arnett's retelling, Simmons was not helpless, or at least not obviously so. If Officer Arnett is believed, while there may have been a constitutional violation, his actions would not violate clearly established law.

The majority chooses to grant qualified immunity despite being presented with two fundamentally inconsistent accounts of this case's critical moments. In concluding that Officer Arnett did not violate clearly established law on an incomplete view of the relevant facts, the majority's approach diverges from the one established by qualified immunity precedent in this circuit. Upon review of all the facts, disputed and undisputed, I cannot endorse the majority's formulation of the law. Accordingly, I would reverse the district court's grant of summary judgment in favor of Officer Arnett and remand for trial determination the factual disputes prior to deciding his entitlement to qualified immunity as a matter of law.

## A.

My analysis begins with Simmons and Officer Arnett's opposing views of the facts. The morning of November 28, 2013, was Thanksgiving day. That morning, Officer Arnett

gave Simmons permission to walk freely out of his cell for his shift as a barber in the facility. Simmons and Officer Arnett diverge on much of what transpired next.

According to Simmons, as he approached the top tier of the building to conduct his business as a barber, he observed what he described as "girl fighting" between one prisoner and a group of prisoners he associated with a prison gang. Simmons recognized this as part of a gang initiation. After about thirty seconds, Officer Arnett commanded the group to stop "horse-playing" but did not use force or call for backup. The prisoners stopped and Officer Arnett took no further action.

At this point, one prisoner, face bloody from the exchange, approached Simmons, and began punching him. Dazed from the attack, Simmons made no attempt to punch back. Even though Simmons did not swing back at his assailant, Officer Arnett shot Simmons in the back of his left shin. Simmons never heard any orders from Officer Arnett before he was shot. Simmons started to collapse from the combination of Officer Arnett's shooting and the other prisoner's punches, and he grabbed hold of the other prisoner's waist for support. Even as the circumstances evolved, Officer Arnett's response remained the same. As Simmons fell to the other prisoner's waistline, Officer Arnett shot him again, this time striking his right thigh. Simmons slipped further down, grabbing for the other prisoner's ankles, when Officer Arnett shot him a third time.

Officer Arnett's version of events differs significantly. By Officer Arnett's account, he observed Simmons and the other prisoner swinging at each other, resembling a "boxing match." In his incident report, Officer Arnett represented that he saw the two hitting each other in the face and upper body. Officer Arnett gave orders to the prisoners to stop

fighting, activated the building's alarm, and called for backup. Because the two prisoners continued to swing at each other despite his command, from a distance of about thirty to fifty feet, Officer Arnett fired his forty-millimeter launcher armed with sponge rounds at Simmons's legs. Officer Arnett chose to shoot Simmons because his back was facing Officer Arnett, obstructing his view of the other prisoner. He shot the sponge rounds aimed at Simmons's legs because it was the less lethal alternative to his other firearm and he was trained to fire at an inmate's lower extremities (excluding the groin area) to minimize the risk of causing severe injury. Officer Arnett could not see any indication that his first shot made impact with Simmons, so he fired a second shot within five or ten seconds of the first. Even after this second shot, the prisoners kept swinging and Simmons remained on his feet, so Officer Arnett shot him again. Before the first shot and after the first and second shots, Officer Arnett gave commands for the prisoners to stop.

Simmons and Officer Arnett agree that additional prison staff entered the area within forty-five seconds of Officer Arnett's call for backup and the two prisoners lay down on the ground without further incident. Simmons could not be handcuffed because he was holding his leg in place so that his protruding bone would not pierce his skin. He then was placed on a gurney so that he could be transferred to the prison's medical facility for treatment.

## B.

Next, I consider the district court's erroneous decision to grant summary judgment in favor of Officer Arnett on the merits of Simmons's excessive force claim. To determine whether a prison guard used excessive force in violation of the Eighth Amendment, we examine "whether force was

applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320–21 (internal citation and quotations omitted). To make this determination, this court follows the five-pronged *Hudson* test: (1) the objective need for force, (2) the relationship between any such need and the amount of force used, (3) the threat reasonably perceived by Officer Arnett, (4) whether Officer Arnett attempted to temper the severity of his response, and (5) the extent of Simmons's injury. *See Furnace v. Sullivan*, 705 F.3d 1021, 1028 (9th Cir. 2013) (citing *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).

The district court's decision shows it viewed the evidence in the summary judgment record in a light less than "most favorable" to Simmons, the non-movant. Although the district court concluded that Officer Arnett "witnessed a violent attack," that Simmons did not fight back, and that Officer Arnett shot Simmons three times to stop the altercation, it did not consider that this evidence also could support a conclusion that Officer Arnett's use of force was maliciously and sadistically intended to cause Simmons harm. Instead, the district court determined that the record only showed Officer Arnett was "misguided" and interpreted Officer Arnett's actions as a response to the situation as Officer Arnett claims to have perceived it, giving disproportionate weight to the facts that Officer Arnett called for backup and chose a less severe means of force. *See Furnace*, 705 F.3d at 1026–27 (observing that "the district court should have adopted" the non-movant's version of the events).

In my view, the majority compounds the district court's error; although the majority purports to view the facts "through an appropriately deferential lens and applied to the

facts of this case," the majority's consideration of the merits instead gives disproportionate weight to the facts supporting Officer Arnett's defense. In its view, because it is undisputed that Officer Arnett had a duty to maintain safety, was not permitted to leave his post, and used "the lowest level of force available to him," no evidence in the record supports an inference that he acted "maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320–21.

However, taking the facts in the light most favorable to Simmons, application of force in this situation would have been warranted only as to the assaultive prisoner, not to Simmons. Yet Officer Arnett shot Simmons while he was under attack from that prisoner. Officer Arnett himself was inconsistent on whether he saw Simmons strike the other prisoner. Simmons maintains that he started to fall after Officer Arnett's first shot, casting doubt on Officer Arnett's claim that he still perceived a threat of violence from Simmons thereafter. Additionally, Officer Arnett admitted that he did not fear for the safety of other prisoners or prison staff, undermining the relevance of his general duty to maintain institutional safety. While Officer Arnett chose the less lethal force option between a sponge launcher and rifle with live rounds, his three shots caused damage so severe that Simmons suffered a fractured leg and permanent nerve damage. This version of the facts supports a conclusion that Officer Arnett purposely inflicted unnecessary and wanton harm on a passive prisoner. *See Marquez v. Gutierrez*, 322 F.3d 689, 692 (9th Cir. 2003) (holding that "[t]o shoot a passive, unarmed inmate standing near a fight" according to the prisoner's account of events would violate the Eighth Amendment).

## II.

## A.

After affirming the district court's holding that Officer Arnett did not violate Simmons's Eighth Amendment rights, the majority makes the additional assessment that Officer Arnett is entitled to qualified immunity. Based on a review of the two precedents Simmons presents, the majority determines that "Simmons makes no effort to identify any relevant precedent" showing that Officer Arnett violated clearly established law. Relying only on the facts that Simmons acknowledged he was grabbing at his assailant rather than passively standing by, and that Officer Arnett used "less-lethal force" on a prisoner engaged in a fight instead of live rounds, the majority "confirms that Arnett's actions are protected by qualified immunity."

I disagree that this is the proper qualified immunity analysis. *See Tolan v. Cotton*, 572 U.S. 650, 655–57 (2014) (observing that "under either prong" of qualified immunity, courts must draw inferences in the non-movant's favor). A court should determine whether a prison official's conduct violated a federal right, which, in the Eighth Amendment context, depends on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320–21 (internal citation and quotations omitted). If a right has been violated, a court asks whether the law was clearly established such that a reasonable prison official would have believed that his or her conduct was lawful. *Martinez v. Stanford*, 323 F.3d 1178, 1183 (9th Cir. 2003).

**B.**

As discussed, under Simmons's version of the facts, Officer Arnett inflicted unnecessary and wanton harm in violation of the Eighth Amendment. Moreover, it has long been established that prison officials use excessive force when they inflict unnecessary harm on a prisoner in bad faith. *Hoard v. Hartman*, 904 F.3d 780, 790 (9th Cir. 2018) (collecting cases).

Simmons's right to be free from excessive force must be tested in "a particular context." *See Todd v. United States,* 849 F.2d 365, 370 (9th Cir. 1988). Thus, the question that remains is whether a reasonable prison guard in Officer Arnett's position could have believed his use of force was a good faith attempt to restore order in the situation he confronted. *Marquez*, 322 F.3d at 693. I believe that the factual dispute in this case leaves that question unanswerable at this juncture. Resolution of the difference between Simmons's testimony that he was clearly the cowering victim of an attack and Officer Arnett's view that Simmons was an able-bodied combatant is central to a determination about the reasonableness of Officer Arnett's decision to shoot Simmons three times. The majority dismissed this distinction as unpersuasive when considering Simmons's and Officer Arnett's factual accounts as part of its Eighth Amendment analysis. But the Ninth Circuit has repeatedly found a dispute of this nature between prisoners and prison guards pivotal in refusing to grant qualified immunity.

In *Martinez v. Stanford*, for example, a panel of this court reversed a district court's grant of qualified immunity to prison officers because triable issues of fact remained on whether they acted reasonably. 323 F.3d at 1184. Under the prisoner's version of events, the prisoner had covered his cell door with a bed sheet to prevent pepper spray fumes from

entering the cell during a prison disturbance. *Id.* at 1180. In response, the officers fired two plastic bullets from a gas gun and a taser cartridge into the cell, with one bullet striking the prisoner. *Id.* From the prisoner's account, "[o]nce the officers entered the cell, they pushed him into a seated position, and tasered him twice on his left arm, despite his lack of resistance." *Id.* Officers continued striking the prisoner while he was restrained and eventually dragged him out of the cell. *Id.* Given the officers' denials, the district court found factual disputes material to the question of excessive force under the Eighth Amendment but did not consider those disputes in its grant of qualified immunity. *Id.* at 1184. On appeal, this court disagreed and concluded that the district court should have evaluated these issues of fact as relevant to whether the officers acted reasonably to qualify for immunity. *Id.* Thus, the panel reversed the district court's decision to grant qualified immunity and remanded for trial to resolve those factual disputes. *Id.* at 1183–85.

*Martinez* does not stand alone. In *Furnace v. Sullivan*, this court again held that "qualified immunity was inappropriately granted at the summary judgment phase." 705 F.3d at 1030 (citing *Martinez*, 323 F.3d at 1184). There, two prison officers sprayed a prisoner with pepper spray, causing the prisoner to suffer burns and rashes to various parts of his body. *Id.* at 1025. The parties disputed two issues. First, they disagreed about how much pepper spray the officers discharged on the prisoner. *Id.* at 1026–27. The district court adopted the officers' version of events with respect to this issue and concluded that the prisoner did not raise a triable dispute. *Id.* Second, the officers argued that the prisoner posed a threat to their safety because he held the food port to his cell open, while the prisoner maintained that he merely "rested his fingers on the already-open food port for balance." *Id.* at 1027. Even though the district court

concluded that this factual dispute was triable, "it premised its award of qualified immunity to the officers on its determination that [the prison officers] could have mistakenly, but reasonably, perceived that [the prisoner] posed a threat." *Id.*

The panel reversed this determination because the "discrepancy" between the parties' accounts was "too great to be capable of resolution on summary judgment." *Id.* The district court erred by failing to draw all inferences in the prisoner's favor. "Had it done so," the district court's "analysis of the prison officers' entitlement to qualified immunity" would have been altered. *Id.* Importantly, though the "factual characterization" between whether the prisoner held the food port open or just rested his hands on it while it was already open "is subtle," the panel concluded that it nevertheless "is relevant to the question of whether [the prison officers] could have reasonably believed that [the prisoner] posed a threat to the safety and security of the institution." *Id.*

More recently, *Hughes v. Rodriquez* found that questions of fact precluded qualified immunity to an officer for excessive force under the Eighth Amendment. 31 F.4th 1211, 1224–25 (9th Cir. 2022). In *Hughes*, an escaped prisoner claimed that, after police officers had apprehended him by placing him in handcuffs, one continued to beat him. *Id.* at 1217. The panel concluded that "whether the post-handcuff beating and dog-biting occurred, and whether it was proportional to the threat [the officer] reasonably perceived by a handcuffed [prisoner], are questions for the trier of fact." *Id.* at 1222–23. Therefore, the panel held that the officer was not entitled to qualified immunity for his conduct. *Id.* at 1224–25.

A similar triable dispute as to the reasonableness of Officer Arnett's use of force remains here. Viewing the facts in the light most favorable to Simmons, not only was Simmons a passive victim of an attack by another prisoner, but also the circumstances could not lead a reasonable guard in Officer Arnett's position to a contrary perspective. For instance, if, as Simmons contends, he did not rush towards his assailant, did not swing back, and lost his footing such that he could not stand upright after the first shot to his leg, it would have been unreasonable for Officer Arnett to believe that Simmons posed a threat to the other prisoner. With no other prisoners or prison staff in harm's way, it likewise would have been unreasonable for Officer Arnett to shoot Simmons two more times, causing severe leg and nerve damage, to restore institutional order. Thus, the dispute about Simmons's behavior in response to the attack should be settled by a jury before a court decides Officer Arnett's entitlement to qualified immunity.[1]

---

[1] I am cognizant of the principle that qualified immunity disputes generally ought to be resolved at the "earliest possible stage in litigation." However, this is usually possible "because qualified immunity most often turns on legal determinations, not disputed facts." *Morales v. Fry*, 873 F.3d 817, 822 (9th Cir. 2017) (citing *Sloman v. Tadlock*, 21 F.3d 1462, 1468 (9th Cir. 1994)). *Morales* also recognized that while the trend in the Ninth Circuit has been resolving qualified immunity at summary judgment, situations still arise where a qualified immunity case must go to trial "because disputed factual issues remain." *Id.* In that situation, qualified immunity "is transformed from a doctrine providing immunity from suit to one providing a defense at trial." *Id.* at 823. The Ninth Circuit's Manual of Model Civil Jury Instructions also recognizes that the situation may arise, explaining that "[w]hen there are disputed factual issues that are necessary to a qualified immunity decision, these issues must first be determined by the jury before the court can rule on qualified immunity." Ninth Circuit Model Civil Jury Instruction 9.34 (2017).

The majority does not appreciate the importance of this dispute to the qualified immunity question evaluating the reasonableness of Officer Arnett's conduct in light of clearly established law.[2] While it is Simmons's burden to show that Officer Arnett violated a clearly established right, *Moran v. Washington*, 147 F.3d 839, 844 (9th Cir. 1998), the majority roundly rejects Simmons's reliance on *Marquez v. Gutierrez* to show that Officer Arnett's conduct violated his clearly established Eighth Amendment right.

In *Marquez*, the Ninth Circuit held that a prison officer was entitled to qualified immunity even though he used excessive force when he used live rounds to shoot a prisoner who was an unarmed bystander to a fight. *Id.* at 692. The officer argued that he believed the target of his shots was a participant in the fight in which two prisoners were kicking one prisoner who was defenseless on the ground. *Id.* The court acknowledged "that the law governing prison officials' conduct was clearly established" when the Supreme Court decided *Whitley*, but it granted qualified immunity to the prison guard under the view that his mistaken belief in the circumstances he confronted entitled him to qualified immunity. *Id.* at 692–93.

Finding *Marquez* of little relevance, the majority interprets it to suggest "that a prison guard should not shoot a fighting inmate with live rounds and should instead take efforts to temper the severity of his response and use less-lethal force." The majority concludes *Marquez* is also

---

[2] The majority characterizes the dispute as, in part, about whether Officer Arnett acted with the requisite malice. Of course, this dispute is relevant to the merits question of Officer Arnett's state of mind, but, independently, its relevance bears on the reasonableness inquiry integral to the qualified immunity analysis as well.

distinguishable from this case. First, it finds that "Arnett did not fire at an inmate who was passively standing near a fight." I agree. A credible view of the record reflects that Simmons was passively *falling* from an attack from another prisoner. That Simmons was also grabbing at the other prisoner does not end the inquiry; rather, it evidences a dispute of fact about whether a reasonable observer would have viewed Simmons as a threat. Second, the majority underscores Officer Arnett's use of sponge bullets, rather than live rounds. But the fact that Officer Arnett shot Simmons three times, severely injuring him, is relevant to whether the force used was unreasonable even if it was not fatal.

The proposition that, under *Marquez*, a prison guard does not violate clearly established law, so long as that prison guard uses less than lethal force to maintain order is not supported by Ninth Circuit precedent. The officers in *Martinez* used plastic bullets, tasers, and their fists, the officers in *Furnace* pepper-sprayed the prisoner, and the officer in *Hughes* beat the prisoner. In all of those cases, this court found a dispute of fact relevant to the qualified immunity analysis despite the use of "less-lethal" force. *Marquez* itself offers little insight into why prison officers' methods of abuse would categorically entitle them (or not) to qualified immunity. Nor can *Marquez* be read to compel a grant of qualified immunity every time a prison officer uses force against a prisoner because that officer could have perceived a threat, without regard to facts that demonstrate otherwise. That formulation of the law is in direct conflict with *Martinez*, *Furnace*, and *Hughes*.[3] Indeed, this court has

---

[3] Notably, the Ninth Circuit has held that disputed facts preclude a qualified immunity analysis in Fourth Amendment excessive force cases as well. *See Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1022 (9th Cir.

never published an opinion citing to *Marquez* on that premise.

To be sure, qualified immunity affords prison officers grace to make reasonable mistakes under pressure. But the dispute between Simmons's set of facts, which would demonstrate that he was a passive victim, and Officer Arnett's facts, which would establish that he perceived Simmons as a combatant, requires trial resolution. While both accounts could potentially coexist in theory, their divergence raises legitimate doubts about the reasonableness of Officer Arnett's claimed perception of mutual combat as the justification for shooting Simmons three times.[4] That

---

2017) (citing *Martinez* for the proposition that summary judgment on a Fourth Amendment excessive force claim is not appropriate when an officer's entitlement to qualified immunity ultimately depends on disputed factual issues); *Lolli v. Cnty. of Orange*, 351 F.3d 410, 421 (9th Cir. 2003) (also citing *Martinez*); *see also Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (holding that officers were not entitled to qualified immunity at the summary judgment stage where there was a triable dispute as to whether they were reasonable in shooting a suspect who was not facing or pointing his gun at them). Recently, the Ninth Circuit applied the same reasoning in a First Amendment case. *See Ballentine v. Tucker,* 28 F.4th 54, 63–64, 67 (9th Cir. 2022) (holding that an officer was not entitled to summary judgment on his qualified immunity claim where there was a factual dispute as to whether the officer arrested the plaintiff because of his anti-police speech, which would be a violation of plaintiff's First Amendment rights under clearly established law, or for legitimate, non-retaliatory reasons).

[4] The notions that Officer Arnett had no other recourse and his actions served to protect Simmons from serious injury or death betray the factual record. There is no dispute that *Officer Arnett* caused serious leg fractures and nerve damage. Shooting Simmons three times in the forty-five seconds it took for other prison staff to arrive while Simmons was a cowering victim arguably put him in more danger, not less. Thus, it remains unclear whether Officer Arnett's response was reasonable.

dispute needs to be resolved before considering qualified immunity for Officer Arnett because it is centrally relevant to the question of whether a reasonable prison guard would know that he or she violated clearly established law by shooting Simmons in that situation. *See Martinez*, 323 F.3d at 1184–85; *cf. Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 796 (9th Cir. 2018) (affirming denial of qualified immunity to prison officers after construing the facts in the light most favorable to the prisoners and considering a jury finding that the officers knowingly violated the law).

## III.

In sum, I would find that the record before us shows: (1) Nurse Lopez's conduct did not rise to the level of deliberate indifference; (2) under Simmons's account of the facts, Officer Arnett violated Simmons's constitutional rights by using excessive force against him to quell an altercation in which he was the victim; (3) that right was clearly established; and (4) whether Officer Arnett acted reasonably such that he was not on notice that his actions violated that clearly established right depends on a trial determination of the factual disputes. Accordingly, I would remand the claims against Officer Arnett to the district court for trial.