**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NICHOLAS DeFRIES,

*Plaintiff-Appellant*,

v.

UNION PACIFIC RAILROAD
COMPANY, a Delaware corporation,

*Defendant-Appellee*.

No. 23-35119

D.C. No.
3:21-cv-00205-SB

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael H. Simon, District Judge, Presiding

Argued and Submitted February 14, 2024
San Francisco, California

Filed June 14, 2024

Before: Sidney R. Thomas, David F. Hamilton,[*] and
Morgan Christen, Circuit Judges.

Opinion by Judge David F. Hamilton

---

[*] The Honorable David F. Hamilton, United States Circuit Judge for the
Seventh Circuit Court of Appeals, sitting by designation.

# SUMMARY**

## Employment Discrimination / Statute of Limitations

The panel reversed the district court's summary judgment in favor of Union Pacific Railroad Co. in an employment discrimination action brought under the Americans with Disabilities Act by Nicholas DeFries.

DeFries was removed from duty as a conductor after he failed color-vision testing and Union Pacific routed him into its fitness-for-duty program. A putative class action had already been filed by a group of Union Pacific employees, referred to as the *Harris* class, in Nebraska district court, alleging that Union Pacific administered its fitness-for-duty program in ways that violated the Americans with Disabilities Act. DeFries qualified as a putative *Harris* class member under the class definition alleged in the original *Harris* complaint, but the *Harris* district court certified a narrowed class proposed by class counsel. The Eighth Circuit reversed class certification, and Defries then filed an individual lawsuit in the District of Oregon, raising claims parallel to the class claims in *Harris*.

The Oregon district court concluded that the commencement of the class action tolled the statute of limitations under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), but the *American Pipe* tolling ended when plaintiffs' counsel in *Harris* voluntarily

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

narrowed the class definition. Accordingly, DeFries's claim was untimely.

Reversing, the panel concluded that there was ambiguity in whether the definition of the certified *Harris* class included color-vision plaintiffs like DeFries, and this ambiguity should be resolved in favor of allowing DeFries, a bystander plaintiff, to rely on *American Pipe* tolling. Thus, DeFries was entitled to tolling as a member of the *Harris* class until the Eighth Circuit issued the mandate for its decision reversing class certification, and his claim was timely. The panel remanded the case for further proceedings.

## COUNSEL

Matthew W.H. Wessler (argued), Gupta Wessler PLLC, Washington, D.C.; Jessica Garland, Gupta Wessler PLLC, San Francisco, California; James H. Caster, Lucas Kaster, Nichols Kaster PLLP, Minneapolis, Minnesota; Anthony S. Petru, Hildebrand, McLeod & Nelson LLP, Oakland, California; for Plaintiffs-Appellants.

William Walsh (argued), Cozen O'Connor, Seattle, Washington; Conor D. Rowinski, Cozen O' Connor, New York, New York; for Defendant-Appellee.

Nadia H. Dahab, Sugerman Dahab, Portland, Oregon; Leah M. Nicholls, Public Justice, Washington, D.C.; for Amicus Curiae Public Justice.

**OPINION**

HAMILTON, Circuit Judge:

This case raises a question of first impression for this court for class-action practice: when does the narrowing of a class definition end *American Pipe* tolling of the statute of limitations for members of a putative or certified plaintiff class? In *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 554 (1974), the Supreme Court established that "commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class." The end of *American Pipe* tolling is less clearly defined than its beginning. The question in this appeal is when the narrowing of a class definition ends *American Pipe* tolling for particular plaintiffs, especially when the scope of the class definition is disputed and ambiguous as applied to those plaintiffs. We conclude that ambiguity about the scope of a putative or certified class should be resolved in favor of tolling so that bystander members of the class need not rush to file separate actions to protect their rights.

Plaintiff-appellant Nicholas DeFries worked as a conductor for defendant-appellee Union Pacific Railroad Company. After failing Union Pacific's routine color-vision testing, he was routed into Union Pacific's employee health screening system, the fitness-for-duty program. In 2018, DeFries was removed from his job and struggled to obtain a new position at the company. At the time DeFries was removed from duty, a putative class action had already been filed by a group of Union Pacific employees, not including DeFries, alleging that Union Pacific administered its fitness-for-duty program in ways that violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. *Harris*

*v. Union Pacific Railroad Co.*, No. 8:16-cv-381 (D. Neb.) ("the *Harris* class").

The parties agree that plaintiff DeFries qualified as a putative class member under the class definition alleged in the original *Harris* complaint.  But in a later motion for class certification, *Harris* class counsel narrowed the proposed class definition.  The revised definition covered "All individuals who have been or will be subject to a fitness-for-duty examination as a result of a reportable health event at any time from September 18, 2014 until the final resolution of this action," incorporating by reference Union Pacific's Medical Rules and its "Reportable Health Events" policy. The *Harris* district court ("the Nebraska court") certified the narrowed class in February 2019.  *Harris v. Union Pacific Railroad Co.*, 329 F.R.D. 616, 628 (D. Neb. 2019).  In March 2020, however, the Eighth Circuit reversed class certification for lack of commonality.  *Harris v. Union Pacific Railroad Co.*, 953 F.3d 1030, 1032 (8th Cir. 2020).

Shortly after the Eighth Circuit's decision, DeFries filed this individual lawsuit in the District of Oregon, raising claims parallel to the class claims in *Harris*.  Union Pacific moved for summary judgment, arguing that DeFries' claims were barred by the statute of limitations.  Anticipating the *American Pipe* tolling issue, Union Pacific argued that the narrowed class definition certified by the Nebraska court had unambiguously excluded color-vision plaintiffs like DeFries.[1]  DeFries had been placed in the fitness-for-duty

---

[1] The term "color-vision plaintiff" refers to a plaintiff who "underwent a fitness-for-duty evaluation solely because he failed the visual acuity test required by the Federal Railroad Administration recertification process." *DeFries v. Union Pacific Railroad Co.*, No. 3:21-cv-00205-SB, 2023 WL 1777635, at *2 (D. Or.  Feb. 6, 2023).

program solely because he failed routine color-vision testing required by the Federal Railroad Administration ("FRA"). Union Pacific argued that failing a routine regulatory exam did not satisfy its definition of a "reportable health event" on the theory that those employees experienced no new diagnosis or change in their color vision. Consequently, Union Pacific argued, *American Pipe* tolling ended for color-vision plaintiffs in August 2018, when *Harris* class counsel moved to certify the class using the narrower definition.

Whether the narrowed class definition included or excluded color-vision plaintiffs like DeFries is the central question of this appeal. The district court accepted Union Pacific's argument and granted summary judgment, finding that color-vision plaintiffs' *American Pipe* tolling ended when the class definition was voluntarily narrowed by plaintiffs' counsel. The district judge in Oregon adopted a magistrate judge's recommendation that tolling ended on August 17, 2018, the day class counsel moved for a narrower definition. The magistrate judge also noted that even if tolling had ended only when the Nebraska court accepted this narrower definition by certifying the class on February 5, 2019, plaintiff DeFries' claim would still be untimely. *DeFries v. Union Pacific Railroad Co.*, No. 3:21-cv-00205-SB, 2022 WL 18936061, at *5 n.6 (D. Or. Nov. 23, 2022), *report and recommendation adopted*, No. 3:21-CV-00205-SB, 2023 WL 1777635 (D. Or. Feb. 6, 2023). DeFries has appealed.

We proceed as follows. Because the end of *American Pipe* tolling has received no attention from the Supreme Court and little attention from the circuit courts, we first explain in Part I the origins and equities of *American Pipe* tolling. In light of both the purposes of *American Pipe*

tolling and the guidance available from other circuits, we conclude that a relevant ambiguity in the scope of a class definition should be resolved in favor of allowing a bystander plaintiff to rely on *American Pipe* tolling. We then turn in Part II to the factual and procedural details of this case. We set out the standard of review in Part III, and in Part IV, we apply the rule to this case. While we believe the better reading of the definition of the certified *Harris* class included color-vision plaintiffs like DeFries, we recognize that there is room for reasonable argument to the contrary. Because a relevant ambiguity in the scope of the class should allow bystander plaintiffs to rely on *American Pipe* tolling, DeFries was entitled to tolling as a member of the *Harris* class until the Eighth Circuit issued the mandate for its decision reversing class certification. DeFries' case is timely.

## I.   *The Origins and Equities of American Pipe Tolling*

*American Pipe* established that "commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." 414 U.S. at 554. "Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied." *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 354 (1983). "At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action." *Id*.

*American Pipe* tolling is "a rule based on traditional equitable powers, designed to modify a statutory time bar where its rigid application would create injustice." *California Public Employees' Retirement System v. ANZ Securities, Inc.*, 582 U.S. 497, 510 (2017). "The watchwords

of *American Pipe* are efficiency and economy of litigation . . . ." *China Agritech, Inc. v. Resh*, 584 U.S. 732, 748 (2018). The doctrine is intended to further both "the principal function of a class suit" and the "functional operation of a statute of limitations." *American Pipe*, 414 U.S. at 551, 554. A class action is intended to function as "a truly representative suit designed to avoid, rather than encourage, unnecessary filing of repetitious papers and motions." *Id.* at 550. To promote the purposes of class actions, *American Pipe* tolling must enable class members to rely on class counsel and the district court to represent their interests *without the need to seek to intervene or file individual suits*.

Meanwhile, the purposes of statutes of limitations are "to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights." *Crown, Cork & Seal,* 462 U.S. at 352. *American Pipe* tolling begins upon the filing of a putative class action complaint, which "commences a suit and thereby notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment." *American Pipe*, 414 U.S. at 555. Alerted by the complaint, a class-action defendant has "the essential information necessary to determine both the subject matter and size of the prospective litigation," *id.*, and to become "aware of the need to preserve evidence and witnesses respecting the claims of all the members of the class," *Crown, Cork & Seal*, 462 U.S. at 353.

Upon the filing of a class action complaint, the fair-notice purpose of statutes of limitations is satisfied "as to all those who might subsequently participate in the suit as well as for the named plaintiffs." *American Pipe*, 414 U.S. at 551; *see also Crown, Cork & Seal*, 462 U.S. at 355 (Powell,

J., concurring) ("When thus notified, the defendant normally is not prejudiced by tolling of the statute of limitations."). Consequently, for purposes of *American Pipe* tolling, "the claimed members of the class [stand] as parties to the suit until and unless" they opt out or class certification is denied. *American Pipe*, 414 U.S. at 551.

The end of *American Pipe* tolling is less clear-cut than its beginning. The problem has split many district courts, including those addressing the same *Harris* class action against Union Pacific. *See Zaragoza v. Union Pacific Railroad Co.*, 606 F. Supp. 3d 427, 435 (W.D. Tex. 2022) ("Broadly speaking, this is a difficult issue that has divided courts for decades."). One line of cases attempts to establish a rule for determining when the voluntary abandonment of a claim by class counsel ends tolling for all class members on that particular claim. *Id*. at 434 (outlining two competing approaches to issue). This appeal concerns a distinct question: how should courts determine when the narrowing of a class definition by class counsel or a district court ends *American Pipe* tolling for particular members of the putative or certified class. Only two federal circuits have expressly considered these narrower issues in precedential opinions. We review those two opinions next.

A. *Other Circuits on Ending American Pipe Tolling*

The Tenth and Fourth Circuits addressed how to determine the end of *American Pipe* tolling when the scope of a class definition is contested in *Sawtell v. E.I. du Pont de Nemours & Co., Inc.*, 22 F.3d 248, 252–54 (10th Cir. 1994), and *Smith v. Pennington*, 352 F.3d 884, 892–96 (4th Cir. 2003).

In *Sawtell*, the Tenth Circuit held that a plaintiff in a product liability action was not entitled to *American Pipe*

tolling and therefore affirmed dismissal of her claim as time-barred.  22 F.3d at 254.  The plaintiff was a New Mexico resident and had filed her claim under New Mexico law.  She sought *American Pipe* tolling based on three putative class actions filed in Minnesota, arguing that she was a putative class member entitled to tolling under the broad class definitions from both the initial complaints in Minnesota and the motions for class certification filed a month later.  *Id.* at 250, 253.

Disagreeing with the New Mexico plaintiff's interpretations of the class definitions, the Tenth Circuit found that the evidence before it indicated the class "was intended to be Minnesota residents only."  *Id.* at 253.  Specifically, the court noted that the suits "were initiated within the Minnesota state court system and pursuant to the Minnesota class action statute," and "did not specify a national class."  *Id.*   The court added: "Although the complaints filed in the Minnesota class actions were broad in their descriptions of the class," the plaintiffs' motions for class certification a month later made "the narrowness of the class definitions . . . clear.  The plaintiffs moved to certify classes of 'those who received the [allegedly defective product] in Minnesota.'"  *Id.*

Against this clear evidence of intent to exclude out-of-state plaintiffs, including the unambiguous narrowing in the motion for class certification, the New Mexico plaintiff "presented no evidence supporting the inference she was a putative member of the class."  *Id.*   The Tenth Circuit distinguished a district court decision concluding that the same class definition was sufficiently ambiguous to extend *American Pipe* tolling to an out-of-state plaintiff for the month prior to clarifying class certification motions.  *Id.* at 253 n.11.  That conclusion, explained the Tenth Circuit, had

been based on "different evidence" that was not part of the record in *Sawtell*. *Id.* (distinguishing *Ganousis v. E.I. du Pont de Nemours & Co.*, 803 F. Supp. 149 (N.D. Ill. 1992)). The Tenth Circuit's more limited evidentiary record showed unambiguously that the New Mexico plaintiff had never been included in the proposed class. *Sawtell*, 22 F.3d at 253. The Tenth Circuit thus affirmed the denial of *American Pipe* tolling for the New Mexico plaintiff. *Id.* at 254. The court also noted that, even if the New Mexico plaintiff had been arguably included in the Minnesota complaint's class definition before the clarifying class certification motion, one additional month of tolling would not have made a difference. *Id.* at 253 n.11.

In the Fourth Circuit case, *Pennington*, would-be intervenors with securities-law claims invoked *American Pipe* tolling based on their purported inclusion within a class definition. 352 F.3d at 886. The Fourth Circuit had to "decide whether, and to what extent, evidence outside of the complaint can be used to construe a definition of a plaintiff's asserted class that is more narrow than what the complaint alone would dictate for the purposes of determining a party's entitlement to tolling." *Id.* at 891. The court decided that it was not "confined to examine *only* the complaint in determining the scope of the class [plaintiffs] sought to certify." *Id.* at 893 (emphasis in original). Instead, "[t]he scope of a plaintiff's asserted class for tolling purposes is that class for which" the purpose of the statute of limitations has been satisfied: the defendant had fair notice as to the substantive claims, number, and generic identities of the potential plaintiffs. *Id.* "In performing this analysis, we can consider evidence outside of the complaint that demonstrates the extent of the class the plaintiff represented to the district court that he desired to have certified—especially when the

complaint itself is unclear." *Id.* Looking to *Sawtell*, the *Pennington* court wrote that, "when a plaintiff moves for class certification by asserting an unambiguous definition of his desired class that is more narrow than is arguably dictated by his complaint, his asserted class for tolling purposes may be limited to that more narrow definition." *Id.* at 894. Ultimately, the Fourth Circuit found that class counsel, on behalf of the plaintiff, had "unequivocally" maintained a narrow class definition for at least a year after filing the original complaint. *Id.* at 894. Because the would-be intervenors sought *American Pipe* tolling for a period that postdated adoption of the unambiguously narrowed definition, the court affirmed the district court's denial of tolling. *Id.* at 895–96.

The key lesson we draw from *Pennington* and *Sawtell* is that to end *American Pipe* tolling, the exclusion of a plaintiff from a revised class definition must be "unambiguous." 352 F.3d at 894. Where the scope of the class definition in an initial complaint "arguably" includes particular bystander plaintiffs, they remain entitled to *American Pipe* tolling unless and until a court accepts a new definition that unambiguously excludes them.

## B.  *Ambiguity and Ending American Pipe Tolling*

*American Pipe* tolling strikes a balance among the efficiency gains of class actions, the procedural due process rights of class-action plaintiffs, and the fair-notice rights of class-action defendants. To maintain this balance, we must attend to the choices that confront bystander plaintiffs like DeFries. Specifically, the tolling rule must clearly instruct bystander plaintiffs that they need not intervene or file independent actions and can instead wait and rely on class counsel and the district court to protect their interests. To

accomplish the purpose of *American Pipe* tolling, bystander plaintiffs should be able to take that passive approach unless and until an unambiguous action removes them from the putative or certified class.

Ending *American Pipe* tolling with anything short of unambiguous narrowing would undermine the balance contemplated by the Supreme Court. It would encourage putative or certified class members to rush to intervene as individuals or to file individual actions. To preserve their right to pursue their individual claims after a potential narrowing, bystander plaintiffs would have to follow the class action closely, looking for any change in the class definition and carefully parsing what it might mean.

That approach would, of course, often require individual plaintiffs to consult attorneys to ensure that they understand their rights as the class action litigation proceeds. In the many class actions that offer only a small recovery to each class member, such a requirement would quickly become financially unreasonable. "[P]otential absent class members will only be able to alert the court to their exclusion if they have knowledge of the pendency of the action, access to legal representation to present their claims, and claims sufficient in size to justify the expense of such representation." Nancy Morawetz, *Underinclusive Class Actions*, 71 N.Y.U. L. Rev. 402, 404–05 (1996). Finding counsel to pursue individual claims after a class action is narrowed may be difficult or impossible for many plaintiffs. *Id.* at 422 ("Even when the excluded class members retain the theoretical right to sue, it may be difficult for those who were excluded to find counsel to pursue relief. . . . There simply may not be another private attorney willing to take on the case of those who were left out of the case." (footnotes omitted)).

If individual claims are large enough to justify counsel for individual suits (as perhaps with many ADA claims over lost jobs), the converse problem might arise: "excluded potential class members may choose to litigate separately, thereby leading to duplicative litigation." *Id.* at 405. If bystander plaintiffs' inclusion in the class were even potentially ambiguous, they would need to intervene or file their own individual suits to assert timely claims. Such duplicative filings would "frustrate the principal function" of a class action by encouraging the "unnecessary filing of repetitious papers and motions," the very "multiplicity of activity which Rule 23 was designed to avoid." *American Pipe*, 414 U.S. at 550–51. That is why Rule 23 "both permits and encourages class members to rely on the named plaintiffs to press their claims." *Crown, Cork & Seal*, 462 U.S. at 352–53. Class members have no "duty to take note of" a potential class suit, "or to exercise any responsibility with respect to it in order to profit from the eventual outcome of the case" before class notice has been sent. *American Pipe*, 414 U.S. at 552. A sound approach to the end of *American Pipe* tolling thus should allow putative class members to rely passively on class counsel when confronted with ambiguous class definitions so that a class action may continue to function as a "truly representative suit." See *id.* at 550.

In sum, we conclude that to end *American Pipe* tolling for a particular bystander plaintiff based on a revised class definition, a court must adopt a new definition that "unambiguously" excludes that bystander plaintiff. *See Pennington*, 352 F.3d at 894. Ambiguity in the scope of the class definition should be resolved in favor of continuing to extend *American Pipe* tolling to members of the putative or certified class. We now apply this approach to this case.

## II.  *Factual and Procedural Background*

### A. *DeFries' Employment History & Color-Vision Testing*

Plaintiff DeFries worked for Union Pacific for fourteen years as a railroad conductor.  This is a safety-sensitive position governed by FRA regulations.  Conductors must pass routine, periodic color-vision screening tests to be recertified for their positions.  These regulations are important for safe and effective use of colored railroad signals in directing trains.

In accordance with FRA regulations, Union Pacific uses a two-stage color-vision screening protocol.  First, it subjects employees to a widely accepted color-vision acuity examination known as the Ishihara test.**[2]**  Second, employees who fail the Ishihara test are subject to an additional color-vision "field test."  The regulations give the FRA or the railroad discretion to further evaluate employees who fail the initial Ishihara test using a secondary field test to determine if they can satisfy the FRA's color-vision standards.

In 2012, a locomotive engineer misidentified a signal due to a color-vision deficiency and caused a fatal head-on collision between two Union Pacific freight trains.  After the accident, the National Transportation Safety Board criticized Union Pacific's color-vision testing program and recommended improvements.  In 2014, Union Pacific began making major changes to its internal "fitness-for-duty"

---

[2] The Ishihara test relies on a series of numbers or other images embedded in dot patterns, with the numbers or images distinguishable from the surrounding dots only by color contrast.  A person with normal color vision should be able to identify the embedded numbers or images. Failing to discern the number or image indicates color-vision problems.

program, modifying its Medical Rules so that employees in safety-sensitive positions suspected of having certain medical or physical conditions could be suspended from work without pay, required to undergo further evaluation, and, frequently, restricted altogether from work with the company. These changes included an update to the "field test" portion of Union Pacific's color-vision testing protocol. After 2014, Union Pacific adopted a new, proprietary "Light Cannon" color-vision field test that the company had developed in-house.

As an employee of Union Pacific in a safety-sensitive position subject to FRA regulations, DeFries had been subjected to repeated color-vision testing. He had failed the Ishihara test at least three times during his employment with Union Pacific. On prior occasions, he had passed the follow-up field test designed by Union Pacific to match his everyday working conditions, so he had been able to continue working. DeFries had no safety incidents during his employment at Union Pacific.

In 2018, after Union Pacific changed its fitness-for-duty program, DeFries was again subject to an Ishihara test under Union Pacific's routine regulatory color-vision testing requirements. He failed it again. Union Pacific then required him to take the new "Light Cannon" field test. DeFries failed that test. He was then routed into the fitness-for-duty program. Union Pacific's chief medical officer diagnosed him with a "Color Vision Deficit" that the company found could not be accommodated. As a result, DeFries was removed from his job as a conductor, and Union Pacific imposed permanent work restrictions that barred him from working any position that required the identification of traffic signals. DeFries tried to find other positions within

the company but was unsuccessful. Union Pacific's permanent work restrictions on him have remained in place.

B. *ADA Challenges to the Fitness-for-Duty Program*

Since 2014, when Union Pacific updated its fitness-for-duty program, several thousand employees have suffered adverse employment actions because of the program. In 2016, several of those employees (not including DeFries) filed a class-action lawsuit against Union Pacific alleging that the company discriminated against employees with disabilities and perceived disabilities in violation of the ADA. *Harris v. Union Pacific Railroad Co.*, No. 8:16-cv-381 (D. Neb.); see 42 U.S.C. § 12112(a), (b)(6). The *Harris* plaintiffs argued that the fitness-for-duty policies screened qualified individuals with disabilities out of Union Pacific's workforce "even though, they argue, they had no trouble fulfilling the essential functions of their jobs." *Harris*, 329 F.R.D. at 620.

The claims centered on the changes Union Pacific made to its fitness-for-duty program in 2014. The company decided that workers with a wide range of medical conditions posed an unacceptable safety risk to the company. Plaintiffs alleged that the company instructed a small team of doctors and nurses to implement standardized policies to screen those workers out of many jobs. *Id.* The company required workers to disclose any "Reportable Health Event," defined as "any new diagnosis, recent events, and/or change" in a specified list of conditions, which included "significant vision . . . changes." If a worker disclosed such an event or condition, or if Union Pacific came to suspect one on its own, the employee was suspended from work and routed into a fitness-for-duty evaluation. During the evaluations, the company's medical team collected information about the

workers and relied on broad, population-based risk assessments to make final judgments as to whether the workers would be permitted to perform their roles. *Id*. at 623. The result, the *Harris* plaintiffs alleged, was that a large group of Union Pacific employees who were "qualified and performing their jobs with no problems" were nonetheless "pulled from their jobs" and left with no recourse. *Id*. at 620–21, 623.

## C. *Harris Class Certification Granted and Reversed*

The parties agree that the *Harris* class, as defined in the operative amended complaint, included color-vision plaintiffs like DeFries. The class was defined as:

> Individuals who were removed from service over their objection, and/or suffered another adverse employment action, during their employment with Union Pacific for reasons related to a Fitness-for-Duty evaluation at any time from 300 days before the earliest date that a named Plaintiff filed an administrative charge of discrimination to the resolution of this action.

Plaintiffs alleged disparate treatment claims on behalf of the class under the ADA, arguing that Union Pacific's fitness-for-duty program discriminated against people with disabilities in violation of section 12112(a) and (b)(6) of the ADA.

As discovery began, Union Pacific argued that this proposed class definition was overbroad because it "could arguably include anyone who was pulled from service temporarily for a regulatory vision or hearing examination—

a total of more than 191,000 employees." Union Pacific argued that the class should include only "fitness-for-duty evaluations related to Reportable Health Events," also phrased as "FFD evaluations initiated because of a Reportable Health Event."

When the named plaintiffs moved for class certification, they proposed a narrower definition of the proposed class: "All individuals who have been or will be subject to a fitness-for-duty examination as a result of a reportable health event at any time from September 18, 2014 until the final resolution of this action." The plaintiffs explained to the court that their definition was intended to correspond to "the list of over 7,000 individuals that [Union Pacific] identified in discovery."

The Nebraska court granted class certification on this narrowed definition of the class. *Harris v. Union Pacific Railroad Co.*, 329 F.R.D. at 628. In granting class certification, the court "approve[d]" sending notice to the "class list" "given to plaintiffs by Union Pacific . . . identif[ying] a total of 7,723 current and former employees" that included individuals situated similarly to DeFries. *Id*. at 627–28.[3]

---

[3] On the same day that DeFries' case was argued, this panel also heard argument in two other color-vision plaintiffs' cases. *Donahue v. Union Pacific Railroad Co.*, No. 22–16847 (9th Cir. argued Feb. 14, 2024); *Blankinship v. Union Pacific Railroad Co.*, No. 22–16849 (9th Cir. argued Feb. 14, 2024). One of those plaintiffs, Justin Donahue, had signed a sworn declaration in support of the motion for class certification later considered by the Nebraska court in its decision to certify the class. *Harris*, 329 F.R.D. at 624 n.3. The plaintiffs in both of those cases appeared on the 7,723-person class list produced by Union Pacific in discovery, which is part of the record in each case. As DeFries explains in his briefs, he was not included on the class list only because it was

Union Pacific appealed the class certification to the Eighth Circuit, arguing that the certified class totaled more than 7,000 workers who had experienced a "broad[] universe of conditions or events" ranging from those who "suffered a stroke" to others who "experienced vision deficiencies." In its appeal, Union Pacific argued that the class was too broad, in part, because it included employees who had a diverse range of conditions including vision deficiencies, citing the declaration of at least one color-vision plaintiff. On March 24, 2020, the Eighth Circuit reversed the district court, decertifying the class. *Harris*, 953 F.3d at 1032. The Eighth Circuit agreed with Union Pacific that, due in part to the variety of disabilities and health conditions within the class definition, the class should be decertified for a lack of both cohesiveness among the class and predominance of common questions of law or fact. *Id.* at 1036–38. Upon decertification, *American Pipe* tolling ended for all putative members of the *Harris* class, including color-vision plaintiffs, when the Eighth Circuit issued its mandate for its decertification decision. That started or restarted the statute-of-limitations clocks for their individual claims against Union Pacific.

D. *DeFries' Individual Suit*

After the Eighth Circuit's decision, DeFries promptly filed an individual charge with the EEOC raising the same claims as the *Harris* class. Within 90 days after the EEOC completed its review of his case, he filed this individual action in federal district court.

---

produced in discovery by Union Pacific on February 26, 2018, before DeFries failed the company's color-vision testing and was routed into a fitness-for-duty evaluation. He is otherwise situated identically to Donahue and Blankinship.

In its motion for summary judgment in DeFries' individual case, Union Pacific argued that DeFries' claims were untimely on the theory that the narrowed *Harris* class definition proposed by counsel and adopted by the district court had unambiguously excluded color-vision plaintiffs. As this theory went, DeFries had not experienced "any *change* in his color vision (or even a new medical condition that might have indirectly impacted his color vision)." DeFries admitted that "he was aware of his color vision deficiencies from a young age." Union Pacific administered color-vision testing not "because of any perceived change in Plaintiff's condition; instead, it did so to comply with the FRA's regulations regarding conductor certification." Union Pacific's theory was that DeFries did not "experience the necessary 'reportable health event' to fall within the *Harris* class definition," so "he was not a putative member." On that theory, Union Pacific argued, *American Pipe* tolling ended for DeFries on August 17, 2018, when *Harris* class counsel moved to certify the narrower class (or when the Nebraska district court adopted that definition). DeFries did not file his EEOC charge until April 2020, well outside the ADA's usual 300-day limit for filing an EEOC charge, rendering it untimely.

The district court accepted Union Pacific's argument on this point. The court granted summary judgment to Union Pacific, holding that DeFries' *American Pipe* tolling ceased when counsel voluntarily narrowed the class definition. To resolve DeFries' case, the district court looked to two earlier decisions by other district courts that had already considered *American Pipe* tolling with respect to color-vision plaintiffs, appeals of which were argued before this panel along with this case: *Blankinship v. Union Pacific Railroad Co.*, No. 21-cv-00072- RM, 2022 WL 4079425 (D. Ariz. Sept. 6, 2022),

*appeal docketed*, No. 22–16849 (9th Cir. argued Feb. 14, 2024), and *Donahue v. Union Pacific Railroad Co.*, No. 21-cv-00448-MMC, 2022 WL 4292963 (N.D. Cal. Sept. 16, 2022), *appeal docketed*, No. 22–16847 (9th Cir. argued Feb. 14, 2024).

All three district courts relied on the Tenth and Fourth Circuit opinions discussed above, *Sawtell* and *Pennington*. And all three courts looked primarily to the text of the narrowed class definition and the definition of "reportable health events" incorporated by reference from Union Pacific's Medical Rules. The court here accepted Union Pacific's argument that

> DeFries was not a member of the class the *Harris* plaintiffs sought to, and ultimately did, certify, because he was not subject to a Fitness-for-Duty examination 'as a result of a reportable health event.' Rather, . . . he was subject to the examination to 'recertify as a conductor.' Further, the record demonstrates that DeFries was aware he had color vision deficiency at a young age, many years prior to his employment with Union Pacific. Thus, DeFries's color vision acuity was not a new diagnosis, recent event, or change in condition, and therefore he did not experience a 'reportable health event' as defined by the *Harris* plaintiffs.

*DeFries*, 2022 WL 18936061, at *4 (internal citations omitted). Relying on this textual analysis, the district court agreed with the district courts in *Blankinship* and *Donahue* that the narrowed class definition excluded color-vision

plaintiffs, meaning *American Pipe* tolling ended for DeFries either upon class counsel's certification motion or upon the district court's grant of class certification. Either way, all of DeFries' ADA claims were found to be time-barred.

The district court also rejected DeFries' arguments, supported by extratextual evidence, that neither class counsel nor the Nebraska court understood or intended the narrower class definition to exclude these color-vision plaintiffs. In addition, the district court rejected DeFries' argument that Union Pacific had admitted color-vision plaintiffs were members of the certified *Harris* class during its successful arguments to the Eighth Circuit that the class should be decertified for a lack of commonality.[4]

## III. *Standard of Review*

We review a district court's grant of summary judgment *de novo*. *Simmons v. G. Arnett*, 47 F.4th 927, 932 (9th Cir. 2022). We take the evidence in the light most favorable to the non-moving party to determine whether there are any

---

[4] After the Eighth Circuit's decertification of the *Harris* class, several federal courts have been presented with similar questions about the end of *American Pipe* tolling based on voluntary actions of class counsel. See *Zaragoza v. Union Pacific Railroad Co.*, 657 F. Supp. 3d 905, 913 (W.D. Tex. 2023) (tolling ended for color-vision plaintiffs when class definition was narrowed), *appeal docketed*, No. 23-50194 (5th Cir. Mar. 20, 2023); *DeGeer v. Union Pacific Railroad Co.*, No. 8:23-cv-10, 2023 WL 4535197, at *6 (D. Neb. June 21, 2023) (same), *appeal docketed*, No. 23-2625 (8th Cir. July 13, 2023); *Bland v. Union Pacific Railroad Co.*, No. 4:17-cv-705-SWW, 2019 WL 2710802, at *1 (E.D. Ark. June 27, 2019) (order denying a motion to stay pending resolution of the *Harris* class, though case was later dismissed with prejudice by stipulation; court accepted as undisputed that a color-vision plaintiff was a member of the *Harris* class prior to opting out). We appear to be the first court of appeals to decide this question.

genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *L.F. v. Lake Washington School District #414*, 947 F.3d 621, 625 (9th Cir. 2020). Appellate review is limited to the record presented to the district court at the time of summary judgment. *National Steel Corp. v. Golden Eagle Insurance Co.*, 121 F.3d 496, 500 (9th Cir. 1997).

IV. *Discussion*

For the reasons explained above, our task is to determine whether color-vision plaintiffs like DeFries were *unambiguously* excluded from the narrowed *Harris* class definition certified by the Nebraska court. We look first to the text of the revised definition. We conclude that the definition was ambiguous, but that the better reading included color-vision plaintiffs. Looking beyond the text of the definition to documents from the *Harris* litigation confirms our interpretation by demonstrating that neither the Nebraska court nor the parties understood the revision to have eliminated color-vision plaintiffs from the class. Only once the class was decertified was DeFries unambiguously excluded from class coverage.

Accordingly, DeFries was entitled to equitable tolling of his claims from the period between the filing of the *Harris* complaint on February 19, 2016, and the Eighth Circuit's decertification of the class when it issued its mandate after its March 24, 2020 opinion.

We begin by looking to the text of the revised class definition, which the district court interpreted to exclude color-vision plaintiffs on the theory that they were subjected to fitness-for-duty examinations as a result of FRA-required routine color-vision testing rather than as a result of a "reportable health event." *DeFries*, 2023 WL 1777635, at

*1–3.   We respectfully disagree and conclude that the revised definition was, at best, ambiguous with respect to plaintiffs like DeFries.  Looking to Union Pacific's Medical Rules, which were incorporated by reference into the class definition, we conclude that individuals who were subjected to a fitness-for-duty examination as a result of failing FRA-required color-vision testing probably *were* included in the class definition as certified.

We begin by setting out the text of the relevant definitions.  The original class definition contained in the *Harris* complaint defined the class as:

> Individuals who were removed from service over their objection, and/or suffered another adverse employment action, during their employment with Union Pacific for reasons related to a Fitness-for-Duty evaluation at any time from 300 days before the earliest date that a named Plaintiff filed an administrative charge of discrimination to the resolution of this action.

Union Pacific agrees that color-vision plaintiffs like DeFries were covered by this definition.

In the motion for class certification, however, *Harris* class counsel narrowed the definition to the following: "All individuals who have been or will be subject to a fitness-for-duty examination as a result of a reportable health event at any time from September 18, 2014 until the final resolution of this action."  All parties agree that the term "reportable health event" refers to Union Pacific's "Medical Rules," a policy document incorporated by reference into the *Harris* class plaintiffs' and DeFries' complaints.  The Reportable

Health Events policy states that every employee in a safety-sensitive position "must report to Health and Medical Services any new diagnosis, recent events, and/or change in the following conditions." The list of conditions includes "Significant Vision or Hearing Change including . . . Significant vision change in one or both eyes affecting . . . color vision."

The district court's narrow reading of "reportable health events" to exclude plaintiffs who failed Union Pacific's routine color-vision testing is not obviously consistent with the text of Union Pacific's Medical Rules. The court's analysis incorporated an implicit assumption that, to qualify as a "reportable health event," the required "vision change" must be a deterioration or other physical change in the employee's color vision. On closer inspection, the definition can also apply to an employee's failure of a vision test as a "recent event," which qualifies as a reportable health event whether or not the failure accompanies some deterioration or other physical change in the employee's vision.

First, limiting a reportable health event to a deterioration or other physical "change" in a listed condition is not consistent with the definition's inclusion "of any new diagnosis, recent events, and/or change," since that limit would render mere surplusage the categories of "new diagnosis" and "recent events." The listed condition relevant here, "[s]ignificant vision change in one or both eyes affecting . . . color vision," embeds an additional requirement that a change must have taken place. But reading the Reportable Health Events policy as a whole, it can indicate that Union Pacific seeks to obtain reports not only of physical changes in health conditions, but also of changes in a health care provider's or patient's *knowledge* and *awareness* of health conditions. This, after all, is the ordinary meaning of a "diagnosis," one of the three

categories of events Union Pacific requires its employees to report.  Thus, the definition's requirement of a "[s]ignificant vision change" is better read to extend to health events that affect only an employee's or a medical provider's *awareness* of the employee's physical status, without requiring a concurrent physical change.  Indeed, other "reportable health events" expressly enumerated by Union Pacific in its Medical Rules include "Diagnosis of epilepsy," "Treatment with anti-seizure medication," and "Diagnosis or treatment of severe obstructive sleep apnea."   None of these "reportable health events" requires any deterioration or other physical change in a pre-existing condition.  Change in the employee's knowledge or awareness of a condition is sufficient.

In addition, Union Pacific's inclusion of the category of "recent events" in its definition should be read to capture events that were neither a "new diagnosis" nor a "change" in one of the listed conditions.  Common sense teaches that a safety-sensitive employee's failure of a color-vision test is the archetype of a "recent event" covered by this category of Union Pacific's definition.  The purpose of Union Pacific's FRA-required color-vision testing protocol is to detect either previously unknown or unreported color blindness in employees holding safety-sensitive positions.  Detection of a previously unknown or unreported medical condition is the ordinary meaning of a "diagnosis."  Though Union Pacific's color-vision testing program does not itself result in a formal diagnosis of color-blindness from a private medical doctor, failure of these tests is an event sufficiently akin to a formal diagnosis that Union Pacific automatically routes anyone who fails this FRA-required testing into a fitness-for-duty examination and labels them as having a "Diagnosis" of "Color Vision Deficit."  Failure of an Ishihara test is exactly

the sort of "recent event" that the company would want to know about under its "reportable health events" policy.

Suppose a Union Pacific conductor or engineer failed an Ishihara test at a routine private doctor's appointment unrelated to any required regulatory testing, and then failed to report this failure to Union Pacific. Suppose further that this employee's color-vision deficiency later resulted in a railroad accident. When it came to light that the employee in such a safety-sensitive position had failed an Ishihara test but failed to report it, Union Pacific would surely contend that the employee had violated its Reportable Health Events policy requiring him to report any "recent event" in the condition of a "Significant vision change . . . affecting . . . color vision." The failure of a test meant to detect color-blindness is the kind of health-related event that the railroad would want to know about. By trying to treat the failure of an Ishihara test undertaken through its own internal color-vision testing program as though it were not a "reportable health event" for purposes of invoking the statute of limitations here, Union Pacific seems to be trying to have its cake and eat it, too.

Finally, nothing in Union Pacific's definition excludes a discovery of a medical condition from being a "reportable health event" simply because the discovery is made internally by the company itself. The district court here addressed cases where a Union Pacific supervisor referred an employee for a fitness-for-duty evaluation because the supervisor observed behavior leading him or her to suspect that that the employee had an unknown or unreported medical condition. The district court said that an employee routed into the fitness-per-duty program based on a supervisor's request *would* fall within the narrowed class definition of having experienced a "reportable health event."

*DeFries*, 2023 WL 1777635, at \*2 (distinguishing *Campbell v. Union Pacific Railroad Co.*, No. 4:18-cv-00522-BLW, 2021 WL 1341037, at \*5 (D. Idaho Apr. 9, 2021) and *Munoz v. Union Pacific Railroad Co.*, 2022 WL 4348605, at \*9 (D. Or. Aug. 9, 2022), *report and recommendation adopted*, 2022 WL 4329427 (D. Or. Sept. 16, 2022)).  We are inclined to agree.  But if a supervisor's suspicion that an employee suffers from unknown or undisclosed color-vision issues constitutes a "reportable health event," it is difficult to read the definition to exclude unknown or undisclosed color-vision conditions discovered (or suspected) based on failure of Union Pacific's internal color-vision testing, whether routine or triggered by a suspected problem.

For all of these reasons, we believe the better reading of the definition is that an employee's failure of Union Pacific's color-vision testing protocol is a "reportable health event." Under this interpretation of the text of the narrowed *Harris* class definition, color-vision plaintiffs like DeFries were included as members in the *Harris* class until it was decertified by the Eighth Circuit.

Still, we appreciate that the district courts in this case and in *Blankinship* and *Donahue* reached a different conclusion. We believe the disagreement reflects genuine ambiguity in the scope of the narrowed class definition as applied to the color-vision plaintiffs.  Under our interpretation of *American Pipe*, that ambiguity requires reversal of summary judgment for Union Pacific.  As we explained above, a bystander plaintiff like DeFries is entitled to continued *American Pipe* tolling until he is unambiguously excluded from the class. That happened here only when the Eighth Circuit reversed

class certification and issued its mandate.  Measured from that event, DeFries' case is timely.[5]

In addition to the text of the revised definition, we may also consider records from the class litigation to the extent that they illuminate whether the parties and the certifying court understood the class definition in a way that would have unambiguously excluded a bystander plaintiff.  In this case, the record includes the following documents from the *Harris* record: Union Pacific's Eighth Circuit opening brief, its petition to appeal from the order granting class certification, plaintiffs' motion for class certification, the declarations of 44 putative class members submitted in support of the motion for class certification, plaintiffs' reply in support of class certification, plaintiffs' First Amended Complaint, excerpts from the deposition testimony of Dr. Holland (Union Pacific's Chief Medical Officer) regarding the definition of "reportable health event," the 7,723-person "class list," and Union Pacific's response to interrogatories complaining that the class definition was overbroad. Together, these documents provide strong evidence that the revised definition was not understood by the *Harris* parties

---

[5] We reject Union Pacific's argument that DeFries waived his argument that the failure of Union Pacific's color-vision testing could itself be a "reportable health event" by failing to raise it in his opposition to summary judgment.  In opposition to summary judgment, DeFries argued that Union Pacific had admitted that the narrowed *Harris* class still included "color-vision plaintiffs" like himself because they "were subject to a Fitness for Duty evaluation following a reportable health event."  That event in his case would have been the failure of Union Pacific's color-vision testing requirements, and he made the statement in a section asserting: "The Term 'Reportable Health Event' Does not Require a Change in Health Condition."

or the Nebraska court to remove color-vision plaintiffs from the class.

We begin by considering the evidence regarding the Nebraska court's understanding of the class at the time of certification. When the Nebraska court adopted the narrower definition, it did not order any special notice to be sent to the putative class members who Union Pacific claims were dropped when plaintiffs filed their motion for class certification. *Harris*, 329 F.R.D. at 627, 628 (certifying class under narrowed definition, ordering notice to the class using 7,723-person class list including color-vision plaintiffs). The Nebraska court referred to and relied on that list, which included color-vision plaintiffs, and the court referred to the declaration of at least one color-vision plaintiff in its decision to certify the class. *Id.* at 624, 627 & n.3.[6]

The extratextual evidence also indicates that class counsel did not believe their revised class definition excluded color-vision plaintiffs from their narrowed class. Class counsel included Mr. Donahue's declaration as an

---

[6] Extratextual evidence shows that even Union Pacific itself understood the class definition to include color-vision plaintiffs. In arguing for decertification, Union Pacific's brief to the Eighth Circuit pointed to "7,000-plus absent class members," including those who "experienced vision deficiencies." It argued that the incoherence of the class was "illustrated" by the "personal stories" of 44 declarants, including some who "experienced vision deficiencies." The 44 declarants included six color-vision plaintiffs, including the plaintiff in another of our cases, Donahue. Though DeFries did not raise judicial estoppel expressly, "we are not bound to accept a party's waiver of a judicial estoppel argument and may consider the issue at our discretion." *Kaiser v. Bowlen*, 455 F.3d 1197, 1204 (10th Cir. 2006). Because we reverse on other grounds, we need not address potential judicial estoppel based on Union Pacific's successful arguments to the Eighth Circuit.

exhibit alongside their motion for class certification. Their motion for class certification referred to and relied on the 7,723-person "class list" that included color-vision plaintiffs. This means that the plaintiffs in *Blankinship* and *Donahue* would have received the class notice ordered by the district court. *Harris*, 329 F.R.D. at 628 (ordering class notice, though order was stayed upon appeal to the Eighth Circuit). DeFries was similarly situated. He was not on that "class list" only because he suffered adverse employment action after the list was produced in discovery.

Accordingly, the extratextual evidence from the *Harris* record shows that neither the Nebraska court, nor class counsel, nor even Union Pacific understood the *Harris* class definition to exclude color-vision plaintiffs. This extratextual evidence reinforces our conclusion from the text of the class definition that color-vision plaintiffs were not unambiguously removed from the *Harris* class prior to decertification.[7]

Union Pacific argues that we should affirm the district court's grant of summary judgment on alternate, merits-based grounds that the district court did not reach. We can affirm on any ground supported by the record so long as the issue was raised and the non-moving party had a fair opportunity to contest the issue in the district court. See *Mansourian v. Regents of Univ. of California*, 602 F.3d 957,

---

[7] In addressing evidence beyond the text of the relevant class definitions here, we do not mean to imply that a class-action *defendant* may rely on such evidence to resolve ambiguities in the scope of a class definition and thereby defeat *American Pipe* tolling. The focus of *American Pipe* tolling is on the choices confronting a bystander plaintiff. We do not mean to imply here that a defendant could show that such a bystander plaintiff's decision not to file a separate lawsuit turned out to have been wrong based on evidence that would not have been readily available to that bystander at the relevant time.

974 (9th Cir. 2010) ("Our discretion to affirm on grounds other than those relied on by the district court extends to issues raised in a manner providing the district court an opportunity to rule on it."); see also *Dachauer v. NBTY, Inc.*, 913 F.3d 844, 847 (9th Cir. 2019) ("Although the district court did not reach [an] issue . . . , we may affirm on that ground because Defendants raised the issue below . . . ."). Union Pacific's asserted grounds, which it raised in the district court, are that DeFries' ADA claims fail as a matter of law because (1) DeFries was not a "qualified individual" due to his color-vision deficiencies, (2) he offers no evidence that the fitness-for-duty program was a pretext for discrimination, and (3) Union Pacific acted under the direction of binding federal regulations.

This court is one of "review, not first view." *Belaustegui v. Int'l Longshore & Warehouse Union*, 36 F.4th 919, 930 (9th Cir. 2022), quoting *Shirk v. United States ex rel. Dep't of Interior*, 773 F.3d 999, 1007 (9th Cir. 2014). The other issues here require close parsing of a voluminous summary-judgment record. "In general, an appellate court does not decide issues that the trial court did not decide," particularly where the issue is not a "purely legal one." *Dep't of Fish & Game v. Federal Subsistence Board*, 62 F.4th 1177, 1183 (9th Cir. 2023) (citations omitted). Union Pacific's alternate grounds for summary judgment are deeply fact-bound, and we do not have the benefit of robust briefing on these issues on appeal. The district court should consider these arguments in the first instance.

The judgment of the district court is REVERSED and REMANDED for further proceedings consistent with this opinion.